[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
This decision is rendered in accordance with Rule 52 of the Superior Court Rules of Civil Procedure. This Court has jurisdiction pursuant to G.L. 1956 §§ 82-13, 9-30-1, 9-30-2, 42-35-7, and 42 U.S.C. § 1983.
 MOTIONS AND SUPPORTING PAPERS
On July 23, 1999, Hartford Park Tenants Association (hereinafter "HPTA"), Debra A. Martin, individually and on behalf of her minor child, Michael J. Martin, Sheila Wilhelm, individually and on behalf of her minor children, Mikaelah Wilhelm, Joshua Wilhelm, and Richard Wilhelm, and Nicholas Marsella (hereinafter, collectively, "the Plaintiffs") filed a complaint seeking an injunction to halt the construction and operation of certain public schools — now named the Anthony Carnevale Elementary School and the Governor Christopher Del Sesto Middle School — (hereinafter "the Schools") — located on Springfield Street in Providence (hereinafter "the Site"), which were being constructed at that time. On August 16, 1999, Plaintiffs moved for a temporary restraining order (hereinafter a "TRO") to halt construction of the middle schools and operation of the elementary school. This motion was denied by the court (Silverstein, J) on September 10, 1999. The order was conditioned on the Muncipal Defendants' following certain procedures such as keeping the elementary school windows closed and conducting soil gas monitoring tests. The case subsequently proceeded to trial.
The complaint contained five counts. In Count One, the Plaintiffs alleged that the Rhode Island Department of Environmental Management (hereinafter "DEM") violated G.L. 1956 § 23-19.14-5, the environmental equity requirement of the Industrial Property Remediation and Reuse Act (hereinafter, the "IPRARA), by approving the City of Providence's (hereinafter "the City" or "Providence") plans to construct schools on the Site. In the remaining four counts, the Plaintiffs alleged violations, through actions or inactions with respect to approving and implementing the City's plans to construct the schools, by the DEM, as well as the City, the Providence School Board (hereinafter "PSB"), and Alan Sepe (hereinafter "Sepe"), in his capacity as Acting Director of the Department of Public Property of the City of Providence (hereinafter the DPP) (the latter three hereinafter collectively the "Municipal Defendants"). Specifically, Count Two alleged that all of the defendants had violated the DEM Rules and Regulations for the Investigation and Remediation of Hazardous Material Releases (hereinafter the "Remediation Regulations"); Count Three alleged that the DEM had violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., and the regulations promulgated there under by the United States Environmental Protection Agency (hereinafter the "EPA"), 40 CFR § 7.10 et seq., and that the City and PSB had violated regulations of the United States Department of Education (hereinafter the "USDE"), 34 CFR 100.1 et seq.; Count Four alleged that all of the Defendants had denied Plaintiffs due process of law in violation of the 14th Amendment to the U.S. Constitution; and Count Five alleged that all of the Defendants had deprived the Plaintiffs of equal protection of the laws, also in violation of the 14th Amendment to the U.S. Constitution. Plaintiffs asserted that Counts Three, Four and Five were all actionable pursuant to42 U.S.C. § 1983, and that Counts Four and Five were also actionable pursuant to Article I, § 2 of the Rhode Island Constitution.
After a preliminary hearing, on March 26, 2003, this Court ruled on multiple motions. This Court denied the following: DEM's and Plaintiffs' cross-motions for summary judgment relating to IPRARA and the Remediation Regulations; the Municipal Defendants' motion for summary judgment against Plaintiffs' claims under § 601 of Title VI and 42 U.S.C. § 1983; Plaintiffs' motion for summary judgment as to their due process and equal protection claims under the federal and state constitutions against the Municipal Defendants; DEM's and the Municipal Defendants' motions to dismiss Plaintiff HPTA on the grounds of lack of standing; DEM's motion for summary judgment on grounds of mootness; DEM's motion for summary judgment as to Plaintiffs' claim for declaratory relief pursuant to G.L. § 9-30-1
et seq. (the Uniform Declaratory Judgment Act, hereinafter the "UDJA"); and DEM's motion for summary judgment as to Plaintiffs' claims under Section 601 of Title VI, 42 U.S.C. § 2000d. At the same hearing, this Court granted the following: DEM's motion for summary judgment as to Plaintiffs' claim for declaratory relief pursuant to G.L. 1956 § 42-35-7 (the section of the Administrative Procedures Act that provides for declaratory judgment on the validity or applicability of agency rules), DEM's motion for summary judgment on Plaintiffs' claims under Section 602 of Title VI, DEM's motion for summary judgment on Plaintiffs' claims under42 U.S.C. § 1983, and Plaintiffs' motion for summary judgment against the Municipal Defendants for violation of Remediation Regulations §§ 7.07 and 10.01.
Trial was held from March through May of 2003. On June 13, 2003, DEM filed a motion to reconsider the ruling denying Defendants' motions for Rule 52(c) Judgment as a Matter of Law, which motion was also denied. The Court ordered a schedule for submission of post-trial briefs and replies, and a schedule for copies of the trial transcripts. The Court also accepted proposed findings of facts from the parties and responses thereto.
 STANDING
As a preliminary matter, both DEM and the Municipal Defendants assert that the HPTA lacked standing to sue. Defendants' main contention is that as an unincorporated association, the HPTA is subject to the provisions of G.L. 1956 § 9-2-11, which limits the type of suits that may be brought by an unincorporated association and delineates the manner in which such suits may be maintained on its behalf. Under § 9-2-11 a civil action may be maintained on behalf of such an association to:
 "recover any property or upon any cause of action for or upon which all the associates may maintain such action by reason of their interest or ownership therein, either jointly or in common, [and] . . . to recover from one or more members of the association his or her or their proportionate share of any money lawfully expended by the association for the benefits of the associates or to enforce any lawful claim of the association against a member or members." G.L. 1956 § 9-2-11.
Additionally, such a suit may only be maintained on the association's behalf by an officer or member "as trustee," and only if "so authorized by the association." Id. Defendants argue that none of the statutory reasons for bringing suit apply: there is no property of the association at issue, no money to be recovered from members, and no lawful claim against a member or members. Defendants also contend that the claim is not one that could be maintained by all of the associates by reason of their interest in the HPTA. Additionally, no officer or member of the HPTA proceeded in this case as "trustee" on behalf of the HPTA and the HPTA did not establish that the association members authorized the suit. Defendants further assert that the HPTA failed to allege the requisite injury in fact required to achieve standing. Plaintiffs insist that compliance with G.L. 1956 § 9-2-11 only implicates the HPTA's capacity to sue and that Defendants waived this defense by failing to raise it in their answers. Additionally, Plaintiffs assert that the evidence established that the HPTA suffered the requisite injury in fact to establish standing.[1]
Standing is "an access barrier that calls for assessment of one's credentials to bring suit." Ahlburn v. Clark, 728 A.2d 449, 452 (R.I. 1999). In general, "[u]nder Rhode Island law, a plaintiff has sufficient standing to sue if he or she alleges "an injury in fact." Burns v.Sundlun, 617 A.2d 114, 116 (R.I. 1992) (citing Rhode IslandOpthalmological Soc'y v. Cannon, 113 R.I. 16, 26, 317 A.2d 124, 129
(1974)). An "injury in fact" has been defined as "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not `conjectural' or `hypothetical.'"Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1974); AssociatedBuilders Contractors of Rhode Island v. Dept. of Admin., State ofRhode Island, 787 A.2d 1179, 1185-86 (R.I. 2002). "When the suit is one challenging the legality of government action or inaction, . . . to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or foregone action) at issue." Id. at 561. "If he is, there is ordinarily little question that the action or inaction has caused him injury." Id.
An association has been held to have standing as a representative if its members, "or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." Warthv. Seldin, 422 U.S. 490, 511 (1975). The Supreme Court has additionally required that "the interests the association seeks to protect are germane to the organization's purpose [and that] neither the claim asserted nor the relief requested requires the participation of the individual members in the law suit." United Food and Commercial Workers Union Local 751 v.Brown Group, Inc., 517 U.S. 544, 553, (1996).
"Capacity has been defined as a party's personal right to come into court, and should not be confused with the question of whether a party has an enforceable right or interest." Wright, Miller Kane, FederalPractice and Procedure: Civil § 1559 at 441 (2d ed. 1990 Supp. 2004);see also Tiffany Agency of Modeling, Inc. v. Butler, 110 R.I. 568, 572,295 A.2d 47, 49-50 (1972). "The distinction between having capacity and having a claim for relief is significant because of its procedural ramifications." Wright, Miller Kane, § 1559 at 442. In Rhode Island, Sup. R. Civ. P. 17 mandates the procedure required to determine who may be a proper party to a law suit. Specifically, Rule 17 (b) states that the capacity of an unincorporated association to sue or be sued is to be determined by state law; and, "[i]t is clear that an unincorporated party is not a proper party in a law suit in Rhode Island" unless the party seeking to include the unincorporated party complies with the applicable provisions of G.L. 1956 §§ 9-2-10 through 9-2-15. See Corrente,759 F. Supp. at 80; Walsh v. Isreal Couture Post, No. 2274 V.F.W. ofthe United States, 542 A.2d 1094, 1095 (R.I. 1988). However, Sup. R. Civ. P. 9 (a) governs the manner in which the issue of capacity — or lack thereof — must be raised:
 "When a party desires to raise an issue as to the legal existence of any party or the capacity of any party to sue or be sued or the authority of a party to sue or be sued in a representative capacity, the party shall do so by specific negative averment, which shall include such supporting particulars as are peculiarly within the pleader's knowledge."
Courts have held that "[t]he phrase `by specific negative averment' means that a party must raise lack of capacity to sue in an appropriate pleading or amendment to avoid waiver." Wagner Furniture Interiors, Inc.v. Kemner's Georgetown Manor, Inc. 929 F.2d 343, 345 (7th Cir. 1991) (interpreting the same words in the corresponding federal rule); seealso Tiffany, 110 R.I. at 573, 295 A.2d at 50 (explaining that corporation's capacity should have been challenged in a responsive pleading). Indeed, the Rhode Island Supreme Court has said that even if a defendant should prevail on the issue of alleged incapacity, the plaintiff should be given a chance to cure the defect. Id. "Since it is a threshold defense, somewhat analogous to lack of personal jurisdiction or improper venue, it should be considered as waived under Rule 12(h)(1) if not raised . . . before trial." Wright, Miller Kane, § 1559 at 442. InWorld-Wide Computer Resources, Inc. v. Arthur Kaufman Sales Co.,615 A.2d 122, 124 (R.I. 1992), the Court explained that waiver was particularly appropriate when the defendant should have been timely alerted by the circumstances to the availability of the defense but delayed mention of lack of capacity until it was unfairly prejudicial to the plaintiff. (Defense of lack of capacity deemed waived where raised at trial after case had been pending four years and plaintiff no longer readily able to comply with statute).
Despite Defendants' classification of the issue as one of standing,[2]
HPTA's compliance, or non-compliance, with § 9-2-11 is clearly an issue of capacity. Furthermore, DEM's answer,[3] raising the bald affirmative defense that "[t]he Plaintiff, Hartford Park Tenant's Association lacks standing to maintain this suit," was not a "specific negative averment" including "such supporting particulars as are peculiarly within the pleader's knowledge." See Marston v. Am. Employers Ins. Co., 439 F.2d 1035, 1041 (1st Cir. 1971). Additionally, defendants have raised the issue of HPTA's lack of capacity four years after the initiation of the law suit even though they had reason to know of the association's non-compliance at the outset since the lack of a named trustee was patently evident in the complaint. Raising the issue at trial, after years of legal skirmishing, when the member make-up, the officers and, indeed, even the name, of the association had changed, created obstacles to compliance that may be difficult for the association to overcome in an expeditious manner. Therefore, to the extent that defendants are now complaining about the lack of capacity of the HPTA to bring and maintain this suit, the issue is waived per virtue of being unseasonably late.
As to injury-in-fact standing, the credible evidence revealed that the tenants of the Hartford Park Public Housing Project are all members of the HPTA by virtue of their tenancies, that such tenants are predominantly non-white and of low economic means, and that the project's proximity (within one mile) to the Site deemed the children from Hartford Park likely candidates for attendance at the new schools. Clearly, the association members, tenants of Hartford Park, living in close proximity to the Site, among those for whose children the schools were sited and constructed, were the objects of the government actions (or inactions) herein challenged — clearly, they were among "the populations surrounding each site" and were both a "low income and a racial minority population" identified by IPRARA as those whom the statute was designed to protect. G.L. 1956 § 23-19.14-5. The HPTA, as a public housing tenants association, operates to advocate for the rights of its members as tenants in matters affecting their living conditions and quality of life. Since its members meet the requirement of injury in fact by virtue of their status as Hartford Park tenants, it follows that the association itself has met the requirement.
In its post trial memorandum, DEM also challenges, for the first time, the standing of each of the other plaintiffs. The Rhode Island Supreme Court has held that failure to raise lack of standing in a timely fashion could result in a waiver of the claim, see Direct Action for Rights Equal. v. Gannon, 713 A.2d 218, 222 (R.I. 1998) (issue of standing waived for appeal if not raised before trial justice); see also Sup. R. Civ. P. 12(h) ("A party waives all defenses and objections which the party does not present either by motion as hereinbefore provided or, if the party has made no motion, in the party's answer or reply . . ."). Notwithstanding the waiver doctrine, this Court finds that the individual plaintiffs have established standing. As to the Martins and the Wilhelms, the first having declined the city's offer to have her son attend the Springfield Street schools, the second having sent her disabled daughter to a Springfield Street school three years after the initiation of this law suit because the brand new school had facilities and amenities not available at other city schools; their injuries in fact result from having to choose between the shiny new school on a contaminated site or the older less equipped school elsewhere. See Associated Builders,787 A.2d at 1185 ("By presenting contractors with the Hobson's choice of submitting a futile bid or not bidding at all, the state caused injury in fact sufficient to satisfy contractors' standing requirements."). Both, too, were among the surrounding populations of lower class and racial minorities that the statute sought to protect. As to Mr. Marsella, he is an abutter of the Site, specifically supposed to be notified both before a site investigation and upon its completion pursuant to IPRARA, who testified that the wind blew soil from the Site during construction onto his property: he is clearly an "object of the government action" and therefore has standing. Lujan, 504 U.S. at 560; see also AssociatedBuilders, 787 A.2d at 1185 ("[T]he line is not between a substantial injury and an insubstantial injury. The line is between injury and no injury.").
 STANDARD OF REVIEW
Rule 52(a) of the Rhode Island Superior Court Rules of Civil Procedure provides that "[i]n all actions tried upon the facts without a jury . . . the court shall find the facts specially and state separately its conclusions of law thereon. . . ." Sup. R. Civ. P. 52(a) (2003). In accordance with this authority in a non-jury trial, "the trial justice sits as trier of fact as well as law." Hood v. Hawkins, 478 A.2d 181, 184
(R.I. 1984). When rendering a decision in a non-jury trial, the Rhode Island Supreme Court has interpreted Rule 52(a) to mean that "the trial justice need not engage in extensive analysis to comply with this requirement." White v. Le Clerc, 468 A.2d 289, 290 (R.I. 1983). "Rule 52(a) does not require the trial justice to set forth all facts presented at trial. The rule also does not require the trial justice to explain why each legal result asserted by a party was not accepted by the court."Kottis v. Cerrilli, 612 A.2d 661, 665 (R.I. 1992). Rather, "brief findings will suffice as long as they address and resolve the controlling factual and legal issues." White, 468 A.2d at 290.
 FINDINGS OF FACT A. PARTIES
1. Plaintiff HPTA is tenants' organization consisting of all residents of the Hartford Park public housing project in Providence. The project contains 388 apartments for low-income families, and another 120 for low-income disabled or elderly persons. The vast majority of Hartford Park households with school-age children are either African American or Latino. The housing project is located less than a mile from the Site.
2. Individual Plaintiff Debra A. Martin, a low-income Providence resident who is white, lives with her son, Michael J. Martin. Michael, who is also white, attended Flynn Elementary School in 1999. In 1999, Michael was offered the choice to attend the new elementary school under construction at the Site, and in 2000 was offered the choice to attend the middle school built there, but he attended neither because his mother did not want him to attend a school built on the "Site". Plaintiff Sheila Wilhelm is a low income resident of Providence, with four children under age 18. Wilhelm's daughter, Mikaelah Wilhelm, is African-American, white and Native American, and disabled and has attended the Springfield Street middle school since May, 2002. Since 1974, Plaintiff Nicolas J. Marsella has owned and lived at 82 Ophelia Street, directly across from the Site.
3. The Defendant City receives federal funds from a variety of sources, including funds from the United States Department of Education (hereinafter the "DOE") to operate public schools in the City. At all relevant times, the City's actions and inactions were made or determined by the City or its agents or employees under color of state law. Defendant Sepe is the Acting Director of the DPP. At all relevant times, Sepe's actions and inactions were made and determined under color of state law. Sepe is white. Sepe performs the duties of the Director of the DPP, which are set forth in the Providence Home Rule Charter, § 1006. Defendant PSB operates and administers the public school system in the City, including the three schools constructed on the Site, and receives funds from the DOE to operate them. At all relevant times, the PSB's actions and inactions were made or determined by PSB or its agents or employees under color of state law. The City, PSB, and Sepe are together referred to as the "municipal defendants."
Defendant DEM is a state agency which regulates, inter alia, the cleanup of hazardous waste sites, and receives federal funds in connection with its hazardous waste programs. At all relevant times, DEM's actions and inactions were taken and determined by DEM or its agents or employees under color of state and federal law.
B. FACTS RELATING TO PROVIDENCE PUBLIC SCHOOLS AND STUDENTS
4. In school year 1997-98, according to the Rhode Island Board of Regents 1999 Information Works Report (hereinafter "Information Works"), approximately 77% of Rhode Island's public school population was white and 23% non-white (the nonwhite population consisting approximately of 7% African-American, 3% Asian, 12% Latino, and 1% Native American). That same year, approximately 23% of the City's student body was white and 77% was non-white (the non-white population consisting approximately of 23% African-American, 11% Asian, 43% Latino, and 1% Native American). In future years, the student population in the City's public schools will continue to be predominantly non-white. In 1998, the City's public school population was projected to grow by approximately 9% over the next five years, according to the Rhode Island Department of Education's 1999Summary of Necessity of Construction Projects. Much of the growth in the school's population is attributable to an influx of Latino families with school age children. Between 1987 and 1999, the percentage of whites in the City's school system decreased over time, from 43% to 19%; the percentage of Hispanics increased from 20% to 48%, the number of blacks and Asians decreased slightly, and were respectively 23% and 10% of the student population in 1999. In 1998, PSB projected that 83% of the students that would attend the Springfield Street Schools would be non-white.
5. The majority of public school students in the City are students from low-income households. Approximately 75% of the student body is eligible for government subsidized lunch programs, compared to 34% of students statewide, according to Information Works.
6. The actual percentages of white and non-white Students at the Springfield Street Schools for the years indicated were as follows:
 2001 2002
SCHOOL %White %Non-White %White %Non-White
Springfield Elementary 16.6 83.4 15.15 84.85
Springfield Middle #1 28.27 71.73 19.95 80.05
Springfield Middle #2 24.1 75.9 17.72 82.28

7. Children in the City have higher rates of environmentally induced illness than children statewide. In 1998, according to statistics maintained by the Rhode Island Department of Health, and reported in the 1999 Rhode Island Kids Count Fact Book (hereinafter "Kids Count"), approximately 31.1% of Providence's children due to start kindergarten in the Fall of 2000 were found to have elevated blood lead levels (in excess of 10:g/dL), compared to 16.1% of such children statewide. In 1998, Health Department statistics indicated that approximately 19.8% of all school-aged children in Providence were found to have elevated blood lead levels (in excess of 10:g/dL), compared to 10.9% of children statewide. Minority children in Providence suffer disproportionately from high levels of lead poisoning when compared to white children in Providence.
8. Moreover, asthma rates are higher among minority children in Providence when compared with the overall city-wide child population. In 1998, Providence had one of the highest rates of hospitalization for asthma for children under 18 years of age in the state. According to Kids Count, Providence's asthma hospitalization rate of 4.2 per 1,000 children is roughly 63% higher than the statewide rate of 2.6 per 1,000 children.
9. Low birth weight is an indicator of a population's overall health. Between 1993-1997, according to Kids Count, the percentage of low birthweight infants in Providence was 8.4%, compared to 6.8% statewide.
10. In 1999, Providence school-aged children suffered a higher rate of malnutrition than did school-aged students statewide. Moreover, non-white (or minority) children in Providence experience higher malnutrition rates than do white children in Providence.
 C. FACTS RELATING TO THE PROCESS FOR SITING AND FINANCING NEW SCHOOLS
11. The school-siting process was triggered when the Providence school Superintendent determined that a new school was needed, contacted the Director of the DPP, and informed the latter of the need. The Acting Director of DPP gathered information from the School Department, including the number of students in the proposed area, the kind of school that is needed, and when the school is needed. The Acting Director compiled a list of properties available for the school, then investigated the size and location of the site before visiting each. When the Acting Director deemed a parcel to be a potential school site, he shared his list with the School Department.
12. The DPP Director next toured each site with School Department officials, discussing the sites and determining which site should be investigated further. The Director prepared a budget only for those sites under active consideration, and made the decision to prepare a budget for a specific site in consultation with School Department officials. The DPP also arranged for a preliminary drawing of a site plan, showing the proposed location of the school building(s) on the site.
13. After a site plan is developed, the City engages an environmental consultant to perform a Phase 1 environmental evaluation. If the results of Phase 1 environmental testing show that the site can be built on, the next step is to undertake a Phase 2 environmental evaluation.
14. In 1998 and 1999, there was no custom or practice for the DPP to notify the public that a specific site for a construction of a school was under consideration.
15. To finance construction of new schools, the Providence Public Building Authority ("PPBA") issues bonds. First, the Mayor requests the City Council to approve the bonds, and the request is referred to the Council's Finance Committee. The PSB must then also vote to approve the issuance of bonds. PSB posted its meeting notices at 797 Westminster Street and published them in the Providence Journal at least 48 hours in advance of a scheduled meeting. Once the City Council approves a resolution to issue bonds, the PPBA must vote to issue them. PPBA posts its meeting notices at 400 Westminster Street, 48 hours in advance of its meetings.
 D. FACTS RELATING TO THE IDENTIFICATION OF THE SITE WHERE THE SCHOOLS WOULD BE BUILT
16. In Fall, 1998, the Superintendent determined that there was a need for an elementary school and two middle schools to open in September of 1999. The need for these schools was based on steady growth in the school's population over the prior five years. For the schools to have opened in September of 1999, construction had to begin by April 1, 1999 or sooner. Upon the Superintendent's determination of need, Sepe, between the Fall of 1998 and February 1999, identified four possible sites for the schools. These sites included:
 The former Almacs Supermarket site on Plainfield Street;
 Neutaconcanut Park;
 Merino Park; and
 The Springfield Street Site where the three schools were ultimately built.
In addition to these sites, the City also considered using a site on Gordon Avenue for the planned elementary school. Had the Springfield Street Site not been available in time for the schools to open in September, 1999, the City would have constructed the elementary school at the Gordon Avenue Site, and transferred the students to Springfield Street the following year.
17. Sepe determined to eliminate the Almacs and Neutaconcacut Park Sites before the preliminary drawing stage of the site selection process. A "chicken scratch site plan" was made for the Merino Park Site, but no environmental tests were conducted there by the municipal defendants. Sepe determined not to proceed with the Merino Park Site after learning it would take a year to get a wetlands permit, and that there were environmental issues relating to the Woonasquatucket River, which abutted the Site.
E. FACTS RELATING TO THE SITE
18. On or about February 10, 1999, the City first announced, to the news media, plans to construct three schools for 1,200 students on the Site. The roughly triangular-shaped site for the three schools is about ten acres, and is bounded by Springfield Street on the east, Hartford Avenue on the north, and a roughly straight diagonal line running from the intersection of Springfield Street and Seton Street towards the intersection of Hartford Avenue and Milo Street. The land surrounding the Site is now primarily residential, with some commercial uses found along Hartford Avenue.
19. The Site was originally an undeveloped wetland which was divided into over 100 individual house lots, but no houses were ever built, and the lots were unfenced. Illegal dumping on the wetland began in the 1950's, and the wetland gradually became an unauthorized municipal landfill, (hereinafter UML). In the mid 1960's, the City assumed operational control of the UML, and operated it until the early 1970's. While in operation, City garbage trucks deposited household trash there, while the City dumped its own trash there on a daily basis, and then bulldozed soil over all of the trash.
20. In the mid 1970's, the City ceased accepting waste at the dump in response to complaints by neighbors of noxious odors and rats. Nonetheless, dumping continued on the site as recently as 1981 and 1982. Approximately 200,000 cubic yards, or 300,000 tons, of waste and fill material was disposed at the Site, of which about 50% is located below the water table. After the City ceased accepting waste, plants and trees sprouted on the soil deposited over the dumped trash. By February, 1999, the Site had become a wooded area.
21. DEM's involvement with the Site dates back to 1989, when DEM inspectors found PCBs present in auto fluff material that had been dumped at the Site. DEM determined the auto fluff material was "not homogenized" and was thus "solid waste as opposed to hazardous waste." Prior to 1999, the general public did not make complaints to DEM about the municipal landfill, nor ask that the municipal landfill be cleaned up.
22. The Site was never a licensed facility for the disposal of solid waste. Neither DEM nor any other state agency ever issued a certificate of closure for the dump.
F. FACTS RELATING TO DEM'S AUTHORITY
23. DEM regulates the cleanup of sites contaminated by hazardous materials. DEM has issued regulations governing the investigation and remediation of hazardous material releases. The Remediation Regulations were promulgated, in part, to implement the Industrial Property Remediation and Reuse Act ("IPRARA"), codified at R.I.G.L. § 23-19.14.1-1et seq.
24. DEM determines a site is jurisdictional under the Remediation Regulations when it has documentation from laboratory analysis verifying that there are at least minimum exceedances of the Direct Residential Exposure Criteria (hereinafter "Residential Criteria")or some other minimum threshold. The Residential Criteria consist of a series of tables establishing conservative risk-based cleanup levels for commonly encountered hazardous substances. Those tables are found in Section 8 of the Remediation Regulations (RISK MANAGEMENT). CRIR 12-180-001 § 8 (2005).
25. For some sites, DEM may require the party proposing a cleanup plan (defined under the regulations as a "performing party") to conduct a site investigation. Id. § 7.0. The Remediation Regulations state that DEM must notify a performing party in writing when a site investigation is necessary. Id. at § 7.02.
26. The Sight Investigation Report (herinafter "SIR") is the report documenting the findings of the site investigation. The purpose of an SIR is to "determine the nature and extent of the contaminated site and the actual and potential impacts of the release." Id. at § 7.01. The scope of the site investigation "shall be tailored to specific conditions and circumstances at the site under investigation using processional judgment." Id. In all cases, however, the data collected must "completely characterize the contaminated site." Id. at § 7.03.
27. For those sites that require remedial action, the site investigation process concludes with the selection of a site remedy. The SIR must propose at least two remedial alternatives other than "no action," and the proposed remedial alternatives are to be "consistent with the current and reasonably foreseeable land usage. . . ." Id. at § 7.04. The proposed remedial alternatives must be supported by data in the SIR that documents, inter alia, compliance with the Tables in Section 8, and compliance with "State and local laws or other public concerns." Id.
After reviewing the SIR, the DEM must then issue a Remedial Decision Letter that directs the performing party to submit a Remedial Action Work Plan (hereinafter "RAWP"). The RAWP describes the technical details of implementing a proposed remedy. Id. § 2.01.
28. Before any remedial action activities proposed in a RAWP may be initiated, the DEM must approve the RAWP. Id. § 10.01. For complex site remedies, DEM's approval of a RAWP occurs via issuance of an Order of Approval; for simple site remedies, DEM's approval occurs via issuance of a Remedial Approval Letter. Id. § 2.01.
29. DEM also regulates sites at which solid waste has been disposed, regardless of whether it is hazardous or not.
30. The preferred, and most protective remedy for closing a landfill in Rhode Island is known as a RCRA Cap, so named because it was developed in connection with the federal Resource Conservation and Recovery Act, which regulates certain hazardous waste materials. A RCRA cap consists of four layers: a base layer, an impermeable layer of clay or geomembrane, a drainage layer, and a vegetative support layer. The base layer is closest to the subsurface and the vegetative layer is on the surface.
F. FACTS RELATING TO THE CONSTRUCTION OF THE SCHOOLS
31. When the City made its February, 1999 announcement that it intended to build schools on the site, it denied that the site was formerly used as a "dump."
32. On March 1, 1999, then-Mayor Vincent Cianci requested the PPBA to issue bonds to finance construction of an elementary and middle school complex at the Site.
33. On or about March 6, 1999, Sepe sent bulldozers to the Site to clear trees and vegetation. No defendant gave abutting residents advance warning that bulldozers would be clearing the Site. When Sepe made the decision to begin bulldozing, the City neither owned the land where the schools were to be built, nor had a building permit to build them.
34. An environmental consulting firm, ATC Associates ("ATC"), was engaged by either DPP or PPBA to conduct environmental testing at the Site. On March 8, 1999, the municipal defendants received preliminary test results from soil samples taken at the Site by ATC, which revealed the presence of lead, arsenic, and total petroleum hydrocarbons in excess of the Residential Criteria. The fax cover sheet from ATC to Sepe accompanying the test results stated that "[t]he metals results came in late Friday — the results show lead and arsenic above standards (not surprising) but if we can eliminate exposure through a cap or engineered cover we should be alright [sic]." Id. On March 12, 1999, the Phase I environmental assessment of the Site was completed.
35. On March 15, 1999, the City's Board of Contract and Supply awarded a contract to O. Ahlborg Sons, Inc. for construction management and building design services for the proposed schools. The request for authorization to enter the proposed contract had actually gone before that Board six to eight weeks earlier.
36. On March 16, 1999, a meeting about the school construction proposal, with ATC and City Council member Igliozzi presiding, was held at the Silver Lake Community Center. The actual March 8, 1999 test results were not shared with the public at this meeting, although the contents of the preliminary test results were discussed.
37. On or about March 25, 1999, the City submitted to DEM a SIR, signed on the City's behalf by Sepe. The SIR indicated the presence of several toxic substances at the Site, including levels of lead, arsenic, and total petroleum hydrocarbons in excess of the Residential Criteria. The report also revealed the presence of volatile organic compounds (herinafter "VOCs") and mercury on the Site. Polychlorinated biphenyls (hereinafter "PCBs") had been found by DEM on the Site in 1988-89. The SIR stated that the City's preferred method to clean up the Site was to: (a) contain, on site, the hazardous waste dumped over the years by depositing two feet of clean fill over the unbuilt areas of the site; (b) excavate, sift soil on the site, and remove the contaminated soil under the elementary school; and (c) install a soil gas collection system in the two middle schools.
38. On April 2, 1999, the City submitted to DEM a RAWP, which detailed its plans to implement the preferred remedy set forth in the SIR. The RAWP submitted on April 2, 1999 was not complete, and additions were made to the RAWP on or about May 3, 1999 and May 9, 1999. As part of the RAWP, the City proposed that solid waste excavated from the dump be processed through a rotating screener, and bulky waste that did not pass through the screen be disposed of off-site. The City proposed to vent soil gases produced at the Site to the surface through soil gas collection pipes installed under the building housing the two middle schools.
39. Sepe asked DEM more than once to expedite DEM's review of the municipal defendants' SIR and RAWP.
40. On April 8, 1999, the Providence City Council approved then — Mayor Cianci's proposal to permit the PPBA to issue bonds to finance the construction of the school complex at the Site, but did not conduct a public hearing prior to its decision.
41. The next public meeting concerning the schools was held on April 26, 1999 at Providence City Hall. The only notice the City ever gave to abutters regarding the site investigation itself, and the SIR generated as a result of the investigation, was for this meeting, and was accomplished, at Sepe's direction, by mailing a flyer only a few days before the meeting was to take place.
42. The City was aware that there would be opposition expressed at the April 26, 1999 meeting and, by letter to DEM's Terrence Gray, asked DEM to be prepared to address the public's anticipated question, framed as "would you . . . send your children to this new school?"
43. The April 26, 1999 meeting was sparsely attended, and held, just after the work day ended, outside of the neighborhood where the schools were to be built. According to the notes of the April 26, 1999 meeting, approximately 12 of 15 people who spoke at the meeting raised concerns about the safety of constructing the schools on the dump. Three of the 12 people identified themselves as being representatives of Latino organizations, although opposition to siting the schools on the Site was expressed by both whites and non-whites.
44. Opposition to siting the three schools on the site was also voiced in the April 26, 1999 meetings of the PSB, where members of the public expressed concern about the safety of building the schools on a former landfill. In fact, on April 26, 1999, the PSB itself voted 4-3, along racial lines, to deny the PPBA permission to issue the school construction bonds. The PSB's three white board members voted to approve the issuance of bonds, even though the City had still not finalized all details of the RAWP by that date. Later that night, the PSB voted unanimously to table consideration of the issuance of the bonds until its May 10, 1999 meeting.
45. By the April 26, 1999 meetings, Sepe, on behalf of the City, had incurred expenses on the Springfield Street Schools project in an amount between $300,000 and $400,000.
46. On May 4, 1999, a special meeting of the PSB was held regarding the issuance of bonds for the three schools. Again, the PSB voted along racial lines, by a vote of 5-3, to reject the issuance of the bonds.
47. During the week of May 1-7, 1999 soil was excavated, sifted and stockpiled on the Site.
48. The City did not apply for a building permit for the schools until May 6, 1999. At Sepe's direction, part of the foundation for the elementary school building had already been poured by that date, and piles had been driven to support the middle school building. Sepe testified that he received a verbal approval from the Providence Building Inspector to start construction, and that in some cases the Inspector allows DPP to start construction on projects with only verbal approval.
49. On or about May 10, 1999, a day after the City finally submitted its completed RAWP to DEM for approval, the PSB reversed itself, and voted 7-1 to approve the issuance of bonds to finance construction of the schools. On May 11, 1999, the City sought DEM's approval to reuse, under the new soil cover, the soil it had already screened, but DEM denied this request by letter dated May 13, 1999.
50. On May 18, 1999, the PPBA took several votes relating to the Site. First, it voted to purchase environmental liability insurance for the school buildings. Second, it voted to include the costs of environmental monitoring and remediation as part of the basic rent to be paid by the City when the City leased back the school buildings from the PPBA. Third, it voted to issue bonds to finance construction of the schools.
51. The City did not have a policy permitting construction of City projects on land not owned by the City, however, the City did not condemn the Site until on or about June 15, 1999, by which time, construction on both school buildings was well underway. Sepe testified that this was a unique situation.
52. The foundation permits for the elementary and middle school buildings were not issued until June 23, 1999. The building permit for the elementary school building was not issued until August 31, 1999, and the building permit for the middle school building was not issued until October 14, 1999.
53. The PPBA reaffirmed its vote to issue bonds for the schools at its meetings on June 22, 1999 and July 13, 1999. At the July 13, 1999 meeting, the PPBA also voted to purchase a 10 year $50,000,000 pollution and remediation liability policy for the schools, and to establish an environmental reserve account for the schools to be funded by the City with annual payments of $40,000, until the account reached $200,000. The bonds approved by the PPBA for the schools included $11,400,000 for the costs of the Springfield Street Elementary School Project and $19,007,600 for the Springfield Street Middle School Complex.
 H. FACTS RELATING TO DEM'S REVIEW AND APPROVAL OF THE MUNICIPAL DEFENDANTS' SIR AND RAWP FOR THE SITE.
54. DEM first learned that the City planned to build several schools at the Site when several concerned neighbors contacted DEM to complain about the City's plans, which had been announced in a news article on or about February 17, 1999. The same day or the next day, DEM contacted the Mayor's office to make it aware of DEM records indicating there was an unauthorized municipal landfill where the City planned to build the schools. Additionally, between February 22 — 26, 1999, DEM received approximately two or three calls a day from neighbors who had concerns about the City's plans to build schools at the Site.
55. In response to the articles and phone calls, DEM met on March 1, 1999 with representatives of the City to discuss the latter's plans for building the schools. At that meeting, the City acknowledged that the Site was a former UML. DEM did not assert jurisdiction over the Site at that time pursuant to the Remediation Regulations. DEM waited until on or about March 10, 1999, when it received sampling information from the City indicating the presence of hazardous materials in excess of the Residential Criteria. DEM reviewed the City's plans only under the Remediation Regulations and IPRARA, but not for compliance with the Solid Waste Regulations. DEM personnel assigned to regulate solid waste facilities were not involved with, or consulted during, DEM's review of the City's plans, other than to review schematic drawings of the proposed sub-slab soil gas ventilation system.
56. When the City began to investigate the Site on February 17, 1999, its consultant ATC informed the municipal defendants that it had found evidence of solid waste disposal on the Site. After this sampling information was sent to DEM, DEM and the City met on March 10, 1999, at which point DEM instructed the City to prepare a SIR for the Site. This instruction was not in writing.
57. DEM officials attended the public meeting at the Silver Lake Community Center on March 16, 1999, where they heard people express opposition to siting schools at the Site for safety reasons. When he learned of this opposition, Terrence Gray, then DEM's Chief of the Office of Waste Management ("OWM"), directed his staff to be present at any public meetings at which the Site was on the agenda, in order that they be available to answer any questions about the use of the Site to build a school.
58. On March 18, 1999, DEM personnel visited the Site and observed construction activity taking place. The next day, March 19, 1999, DEM issued an Immediate Compliance Order, which directed the City to "[i]mmediately cease all excavation and stockpiling activities at the Site until the Site Investigation is completed and approved by OWM and a Remedial Action Work Plan (RAWP) has been submitted to the Office of Waste Management and approved." The order also stated that the City's unauthorized excavation and disposal of hazardous material and solid waste at the Site "presents an imminent hazard to the public health, safety, and to the environment and that the performance required by this Order is necessary to protect the public health and the environment."
59. DEM finally received the City's SIR on March 25, 1999. As part of the site investigation, the City took 23 groundwater samples and sent 5 samples for laboratory analysis, and also took 24 soil samples and 12 soil gas samples, with 4 soil gas samples sent out for laboratory analysis. The SIR listed all of the limited number of hazardous substances for which the City tested. The City did not test for several of the hazardous substances for which safety standards had been promulgated under the Residential Criteria, including metals such as beryllium, copper, cyanide, manganese, nickel, thallium, vanadium, and zinc; pesticides such as chlordane and dieldrin; and semi-volatile organic compounds (Remediation Regulations, Section 8, Table 1). DEM did not determine whether there were concentrations of these substances present at the Site in excess of the regulatory criteria.
60. The SIR proposed three remedial alternatives for the Site: (1) no action; (2) removal of all solid waste at the Site, with replacement of the removed waste with clean fill; and (3) installation of an "engineered" cover of two feet of clean fill over the unbuilt portion of the Site, with installation of a soil gas collection system under the elementary school building. The report did not propose installation of a RCRA cap, and identified option number 3 as the preferred remedy.
61. On April 2, 1999, ATC submitted a RAWP to DEM without any detailed drawings of the proposed construction or remedial systems. The remedy proposed in the RAWP included the following: (1) placement of two feet of clean fill on the unbuilt areas of the site on top of an indicator barrier, except in unbuilt areas to be covered by pavement, where one foot of clean fill with a geotextile fabric would be placed between the existing ground and the pavement; (2) excavation of waste material underneath the school buildings, and sifting of excavated soil through a screener to separate it from bulky waste, with both the soil and waste disposed of off site; and (3) the installation of a soil gas collection system under the school buildings.
62. On April 9, 1999, DEM issued the City a Remedial Decision Letter, wherein DEM determined that the site investigation was complete, and approved the conceptual remedy proposed by the City in the SIR. In the Remedial Decision Letter, DEM expressly deferred approval of a request by ATC to begin pile driving at the Site "until the public has had the opportunity to comment on this entire proposal." Following the issuance of this letter, the meeting of April 26, 1999 was held at City Hall. DEM did not receive any substantial comments concerning the investigation itself at the March 16, 1999 meeting. Although by March 16, 1999 DEM was aware about public concerns related to the safety of building a school at the Site, it did not direct the City to conduct another public meeting prior to the issuance of the Remedial Decision Letter.
63. DEM did not return the SIR to the City as being incomplete for not testing all of the substances listed in Table 1 of Section 8 of the Remediation Regulations.
64. DEM does not have a policy or practice by which it informs the public that it is reviewing a SIR; DEM maintained that the obligation for notifying abutters that an SIR is under review falls on performing parties.
65. The Remediation Regulations require notice to abutters when the site investigation is complete, yet before April 9, 1999, no notice was sent to abutters by the City informing them that it was complete. Nor was notice sent to abutters regarding the March 16, 1999 meeting at the Silver Lake Community Center. The only notice that was sent by the City to abutters concerning the site investigation was the flier announcing the meeting at City Hall on April 26, 1999. This meeting occurred two weeks after DEM issued its Remedial Decision Letter, in which DEM had already found the site investigation complete.
66. The April 26, 1999 public meeting was planned at a meeting held on April 19, 1999, attended by 12 people, including representatives from DEM, the City, PPBA, ATC, and contractors working on the project. All of the persons attending the meeting were white, with the exception of a person whose race was not remembered. At this planning meeting, DEM and the City agreed that ATC would make a presentation at the April 26, 1999 meeting. DEM arranged to have Dr. Vanderslice from the Department of Health available to answer questions posed by the public. The subject of the City's proceeding with pile driving prior to the public meeting was also discussed.
67. Opposition to siting the schools on the Site was expressed at the April 26, 1999 meeting. DEM did not schedule any additional public meetings about the City's plans for the Site. DEM did not establish a period to consider public comments with respect to the technical feasibility of any of the competing remedies proposed by the City in either the SIR or the RAWP.
68. Following the April 26, 1999 public meeting, DEM amended the Immediate Compliance Order on April 27, 1999 to allow the City "to commence with only the pile portion of the Remedial Action Work Plan. . . ." That was the only amendment made by DEM to the initial Immediate Compliance Order.
69. By April 27, the City had already proceeded with other activities barred by the original Immediate Compliance Order. Photographs taken by DEM on April 29, 1999 show that the City had begun sifting soil, and DEM had knowledge prior to that date that the sifting had begun. The City had also caused soil to be excavated, and segregated bulky solid waste material from other soil material. Construction of the elementary school had begun by April 29, 1999. DEM had received complaints that people were suffering from adverse health impacts from odors and dust released by the soil sifting activity, and DEM personnel themselves smelled odors of rotting trash at the Site.
70. Although DEM knew that the City's actions violated the Immediate Compliance Order, DEM took no enforcement action against the City. Rather, DEM sent the April 27, 1999 letter amending the Immediate Compliance Order, which indicated that DEM was giving the City "permission to proceed only with pile driving and nothing else."
71. DEM received numerous requests from Sepe, and the City's Mr. Troiano, to expedite its review of the City's SIR and RAWP. DEM agreed to their requests. DEM did so because the City claimed it had to construct the schools on an expedited schedule in order for them to open on September 1, 1999.
72. DEM viewed this matter as a "voluntary project" under DEM's Remediation Regulations.
73. DEM was aware that there were non-white persons who opposed using the Site for a school. This opposition did not cause DEM to slow down its review of the City's plans for the Site. DEM knew that the Site was in a community with a high population of minority and low-income residents, and that DEM was required to analyze environmental equity issues relative to the Site under IPRARA. DEM did not have any threshold standard to determine whether a particular site is an "environmental equity" site within the meaning of that statute. DEM's review of environmental equity issues was confined to the generic issues, applicable to any population proximate to an IPRARA site, such as the effect that a cleanup would have on surrounding populations, the risk to the community before and after the site was cleaned up, the incremental benefit of the clean up, and the benefit to the community of removing and containing waste.
74. DEM did not specifically address issues of environmental equity for racial minority and low-income populations related to the use of the site for a school. DEM did not directly consider any demographic, public health or statistical data because it "stipulated that [the site] was an environmental equity community." DEM only indirectly considered demographic data by referencing maps of low income and minority communities that were supplied by EPA, and contained in grant applications filed by DEM in previous years. DEM did not prepare any document that contained DEM's consideration or assessment of issues of environmental equity.
75. In 1999, DEM viewed the environmental equity provision of IPRARA as relating only to issues of public participation, and thus did not undertake any other measures relative to environmental equity other than the "minimal" public participation requirements of IPRARA.
76. DEM approved the City's RAWP by Order of Approval dated June 4, 1999. By that date, the first floor of the elementary school building had already been erected, and work on the second floor had begun; foundation work on the middle school building had been started as well.
77. When a site contains contaminants in excess of the Residential Criteria, DEM's policy and regulations require an environmental land use restriction to be placed on the land records, such as the deed. As of the date of trial, the land use restriction was still being drafted.
78. As of the date of the trial, the Site was the only one in DEM's data base of 1,200 contaminated sites on top of which a school has been built. Prior to this matter, DEM did not have any experience with evaluating a cleanup plan for a contaminated site to be used as a school ground.
FACTS RELATING TO HEALTH RISKS FROM SUBSTANCES FOUND AT THE SITE TOCHILDREN ATTENDING THE SCHOOLS BUILT ON THE SITE[4]
79. Lead poisoning in children is exacerbated by additional exposures to lead. Childhood lead poisoning leads to lowered IQ. A child with a lead level of 10 micrograms per deciliter (:g/dL) has a lower IQ on average of about 7 points, and for those children with lead levels above 10:g/dL, for every additional 10:g/dL of lead there is approximately a 5 point decrease in IQ. Children with blood lead levels in excess of 30:g/dL are five to seven times more likely to drop out of high school. Lead poisoning also causes permanent brain damage.
80. Chronic exposure to low levels of arsenic can cause peripheral nerve damage, resulting in numbness and tingling in the hands and feet. Such exposure also causes organ damage, particularly to the kidney.
81. Chronic exposures to low levels of petroleum hydrocarbons and VOCs can trigger attacks in people who have asthma, cause learning disabilities, and decrease IQ.
82. Asthma is also triggered by metals such as nickel and chromium (particularly chromium 6, or "hexavalent chromium"), and acid gases such as sulfuric acid, nitric acid and hydrochloric acid.
83. Children who are lead poisoned are more likely to absorb higher levels of other environmental contaminants to which they are exposed than children who are not lead poisoned. Since Providence school-aged children have higher rates of lead poisoning than students statewide, children in Providence are more susceptible to intoxication or poisoning from environmental exposures to other substances than are children statewide.
84. Children who are malnourished are more susceptible to environmental hazards as well. When malnourished children are exposed to a given amount of a toxin, they will often absorb more of the toxin than well-nourished children exposed to the same level of toxin. Malnourished children at a site where they may be exposed to toxins are at higher risk of harm from the exposure than children who are not malnourished.
85. When metals such as lead and arsenic are found in soil, those metals can leach out of the soil and enter the groundwater, depending on the type and permeability of the soil, and the pH of the soil and rainwater. The groundwater can transport the dissolved portion of the contaminants, which can be moved within a site or off the site through groundwater.
86. A RCRA cap prevents surface water from infiltrating through contaminated material, which can otherwise leach contaminants into the groundwater, and either travel through the groundwater or, in some instances, percolate to the surface. A geotextile membrane would inhibit groundwater from rising to the surface, whereas the permeable orange indicator barrier actually installed at the Site cannot and will not obstruct groundwater from coming to the surface. The RAWP provided for the installation of a geotextile membrane under the pavement laid for use as a parking lot and playground. A RCRA Cap never came up for discussion during DEM's review of the remedy
87. The exposure pathways for lead are either inhalation of lead dust or swallowing substances containing lead. The exposure pathways for arsenic are the same as lead. Additionally, arsenic may be absorbed into the skin. The exposure pathways for petroleum hydrocarbons are ingestion, inhalation, and absorption through skin and mucus membranes.
89. The RAWP's action level for carbon dioxide is 1,000 parts per million (ppm) or 0.1%. Symptoms of exposures to levels of carbon dioxide in excess of 1,000 parts per million include headaches, dizziness, tiredness and lethargy.
90. When soil gas action levels are exceeded, the RAWP states that the City would conduct a more thorough assessment, including the installation of additional soil gas monitoring wells; and where excedences still occur, the monitoring wells will be converted to soil vapor extraction wells.
 COUNT ONE: THE IPRARA
Plaintiffs contend DEM violated Section 5 of IPRARA in two ways. First, DEM failed to "consider the issues of environmental equity." Second, DEM failed to provide for proper notice and community involvement. DEM counters that IPRARA is inapplicable to the facts of this case or, in the alternative, if the statute does apply, that DEM substantially complied with, or exceeded, its requirements.
Applicability.
The threshold issue for this Court is whether or not Section 5 (a) of IPRARA applies. DEM argues that Section 5 (a) only requires DEM action if a particular site clean-up is performed by a "bona fide prospective purchaser" who enters into a "settlement agreement" and obtains a covenant-not-to sue from the state along with protection from contribution claims by "responsible parties." G.L. 1956 §§ 23-19.14-1,23-19.14-2, 23-19.14-3(b), 23-19.14-6, 23-19.14-6.1, 23-19.14-10,23-19.14-12. As a former operator of, and generator and transporter of waste to the Site, the City is a "responsible party" as defined by the statute, and could therefore never be a "bona fide prospective purchaser." Sections 23-19.14-2, 23-19.14-6(a). DEM suggests that any effort on its behalf to encourage public participation in the investigation/remediation process at the Site was a voluntary attempt to adhere to the "spirit of IPRARA" or a result of DEM's own regulatory requirements and was not due to any statutory obligation.
A court's "ultimate goal is to give effect to the purpose of the act as intended by the Legislature." Labor Ready Northeast, Inc. v. McConaghy,849 A.2d 340, 344 (R.I. 2004) (quoting Stebbins v. Wells, 818 A.2d 711, 715
(R.I. 2003) (quoting Mottola v. Cirello, 789 A.2d 421, 423 (R.I. 2002)). "It is a primary canon of statutory construction that statutory intent is to be found in the words of the statute, if they are free from ambiguity and express a reasonable meaning." Little v. Conflict of InterestComm'n, 121 R.I. 232, 237, 297 A.2d 884, 887 (1979) (superceded by statute). If a statute is unclear, a Court must give weight and deference to its construction by the agency charged with its enforcement, unless the agency's construction is unauthorized or clearly erroneous. LaborReady, 849 A.2d at 344 (quoting Little, 121 R.I. at 236, 297 A.2d at 886). However, when the language of a statute is clear and unambiguous, "it declares its own meaning and there is no room for construction." Little,121 R.I. at 237, 297 A.2d at 887. The Court "presume[s] that the [l]egislature intended every word, sentence, or provision to serve some purpose and have some force and effect . . . [the Court] will not interpret a statute in a manner that would defeat the underlying purpose of enactment." Pier House Inn, Inc. v. 421 Corp., 812 A.2d 799, 804
(R.I. 2002) (citing Dias v. Cinquegrana, 727 A.2d 198, 199-200 (R.I. 1999) (per curiam)).
Section 5 of IPRARA, reads, in pertinent part, as follows:
 "§ 23-19.14-5. Environmental equity and public participation. —
 (a) The department of environmental management shall consider the effects that clean-ups would have on the populations surrounding each site and shall consider
the issues of environmental equity for low income and racial minority populations. The department of environmental management will develop and implement a process to ensure community involvement throughout the investigation and remediation of contaminated sites. That process shall include, but not be limited to, the following components:
 (1) Notification to abutting residents when a work plan for a site investigation is proposed;
 (2) Adequate availability of all public records concerning the investigation and clean-up of the site, including, where necessary, the establishment of informational repositories in the impacted community; and
 (3) Notification to abutting residents, and other interested parties, when the investigation of the site is deemed complete by the department of environmental management.
 (b) This community involvement process will be coordinated with the public notice and comment opportunity provided in § 23-19.14-11 when a final settlement is proposed." (Emphasis added).
The plain, unambiguous language of Section 5 (a) is a clear statutory enactment. There is a legal subject (DEM), legal action (shall consider and will develop) and a case to which the legal action is confined (clean-ups or the investigation and remediation of contaminated sites).See Norman J. Singer, Statutes and Statutory Construction § 32 A:6 849(6th ed. 2002). Clearly, the statute mandates DEM's responsibilities in involving the community in the investigation and remediation of contaminated sites. In fact, DEM does not argue that Section 5 (a) is ambiguous, but, rather, the Department contends that Section 5 (b) limits the applicability of Section 5 (a) to those sites subject to a final settlement proposal. ("will be coordinated with . . . when a final settlement is proposed"). DEM suggests that a reading of IPRARA as a whole shows that the public comment provision in Section 11 is contemplated by the public participation requirement of Section 5, such that the two sections work together as part of a continuous process ("Notice without comment doesn't create much involvement by the community." DEM Brief); that the comment provision only applies when a settlement has been proposed; and, that only "bona fide prospective purchasers" may enter a settlement agreement. The Department also maintains that the overriding intent of the statute, as gleaned from the legislative findings and the declaration of policy, was to encourage "bona fide prospective purchasers" to clean and develop contaminated sites.
However, the plain, unambiguous language of the statute does not conform to DEM's interpretation. Notwithstanding the clarity of Section 5 (a) itself, Section 5 (b) is equally clear and unambiguous. Section 5 (b) contains a legal subject (DEM), a legal action (coordinate with Section 11) and a case to which this legal action is confined (when there is a settlement agreement proposed). Id. The word "when" is used to signal the case "if a single or rare occasion is contemplated." Id. Clearly, in the (rare) event that there is a settlement agreement proposed, DEM must harmonize the public participation process of Section 5 (a) with the notice and comment procedure outlined in Section 11. If the case does not occur, if a settlement proposal is not made, then Section (b) does not apply. There is no language in Section (b) limiting the applicability of Section (a). Section (a) applies and DEM must act whenever there is a site clean-up; Sections (a) and (b) apply whenever there is a site clean-up subject to a proposed settlement agreement.
Additionally, reading the statute in its entirety crystalizes the clear intent of the General Assembly to impose upon DEM the task of developing and implementing environmental equity and public participation processes for the clean-up and remediation of contaminated sites, whether or not a settlement agreement is proposed. In the first place, the prospect of a settlement agreement is purely permissive — "the state may enter into an agreement." Section 23-19.14-10 (a). It follows that the state may also decide not to enter an agreement, particularly when it "determines that the response action will not be done properly," while still overseeing a site clean-up. Id. Since the occasion for the proposal of a settlement agreement is merely discretionary, the application of Section (b) to the community involvement process of Section (a) is subject to that original discretion. Section (a) clearly intends to provide for community involvement in the site remediation process. Limiting that involvement to times when a settlement agreement is proposed would render the enactment a nullity, since DEM could, at is discretion, never agree to a settlement proposal, and therefore, never involve the public in any site remediation effort. See Pier House Inn, Inc., 812 A.2d at 805.
Furthermore, the statute, arguably, does not limit the option of a settlement agreement to "bonafide prospective purchasers." The statute, which includes a broad definition of person, allows the state to enter such an agreement "with any person to perform any response action if the state determines that that action will be done properly by the person." Section 23-19.14-10. (emphasis added). In fact, the stated reason for a settlement is "to expedite remedial action and minimize litigation." Id.
Indeed, a party is deemed to have "resolved its liability to the state under this chapter." Section 23-19.14-12. Finally, the settlement "reduces the potential liability of [other potentially liable persons] by the amount of the settlement." Id.
Basically, IPRARA aims to encourage the reuse and redevelopment of contaminated sites in Rhode Island by qualifying and controlling liability issues. The legislative findings are broad and recognize that there are "hundreds" of contaminated sites; that liability is often an obstacle to redevelopment; and, that "proper redevelopment and reuse" would yield economic and environmental benefits. Sections 23-19.14-1. Secondly, the declaration of policy asserts that
 "the state will assure that (1) Activities are taken to control and eliminate contamination at industrial properties that are fair, consistent, and compatible with current and reasonably foreseeable use of the property; (2) Environmental barriers to economic redevelopment and beneficial reuse of contaminated properties are removed; (3) Opportunities are available for businesses to realistically manage their environmental liabilities; and, (4) Voluntary and cooperative clean-up actions are encouraged to the greatest extent possible." Section 23-19.14-2.
Neither the findings nor the policy suggests that "bona fide prospective purchasers" will be the only parties encouraged to act in furtherance of the statute's aims. In fact, responsible parties, such as the City, are expressly penalized for failure to do so. Section 23-19.14-6. DEM's own regulations admit that the goal is to protect human health and the environment by encouraging site remediation by both "responsible parties" and "bona fide prospective purchasers." C.R.I.R. 12-180-001 § 2.02 (2005).
While it is uncontroverted that DEM is the agency charged with enforcing IPRARA, see § 23-19.14-18, deference to the department's interpretation is not required where the plain language is clear. Therefore, the clean-up of the Site by the City is subject to the provisions of the statute, specifically Section 5 (a), as well as its "spirit."
Environmental Equity.
Section 5(a) provides: "[t]he department of environmental management . . . shall consider the issues of environmental equity for low income and racial minority populations." Plaintiffs assert that DEM violated this provision when approving the city's SIR and RAWP for the Site. Plaintiffs fault DEM for lacking a policy with which to address the environmental equity component of IPRARA and for failing to specifically consider environmental equity issues in its handling of the site investigation in this case.
Plaintiffs first call the Court's attention to the fact that the applicable Remediation Regulations make no mention of environmental equity and that the DEM had no other established policy to address environmental equity issues in place at the time of these events. Furthermore, Plaintiffs claim that DEM's review of the Site was confined to generic issues, applicable to any type of population, and that DEM did not specifically address issues related to the use of the Site for a school to serve minority and low income children. The Plaintiffs also argue that because DEM stipulated that the Site was in an environmental equity community, it did not directly consider any demographic, public health, or statistical data.
DEM counters that the requirement of consideration imposed upon it by IPRARA does not amount to a requirement to develop and implement a separate environmental equity policy; therefore, the lack of such a policy and the lack of any mention of environmental equity in the Remediation Regulations does not indicate that the Department failed to consider the issue. DEM suggests that since every site investigation is unique, there can be no fixed formula for determining whether a project will result in a disproportionately negative environmental impact on a particular community. Furthermore, DEM contends its efforts to maximize opportunities for public input about the clean up and redevelopment of the Site, which it claims went beyond the requirements of IPRARA, evidence a serious consideration of the environmental equity issues facing the surrounding low income and minority population. DEM also maintains that it recognized the Springfield Street area as an environmental equity location immediately, and considered various factors — such as, the nature of the activity proposed, the applicable regulatory standards, and the nature of the approved remedy — as they related to environmental equity. Additionally, DEM argues that the substantial remedial components it added to the City's remedy evidence its consideration of environmental equity. The remedial components DEM specifically required included: (a) the installation of the sub-slab ventilation systems; (b) the removal of 20,000 tons of solid waste (including all waste beneath the elementary school building) in order to increase the separation between the building foundations and any waste that remained on-site and; (c) the installation of a thirty-three perimeter soil-gas monitoring wells and (d) a twenty-year commitment to monitor the sub-slab ventilation systems and the soil-gas and groundwater wells around the property.
This Court presumes the legislature intended every sentence to serve some purpose, see Pier House Inn, 812 A.2d at 804, and gives the words their plain and ordinary meanings. See State v. Santos, 870 A.2d 1029, 1032 (2005). To "consider" is to "think about carefully." Webster's NinthNew Collegiate Dictionary, 279 (1983); see also Greene Citizens forResponsible Growth, Inc. v. Greene County Bd. of Comm'rs, 547 S.E. 2d 480, 482 (2001). "Environmental equity" is a technical term that "refers to the distribution and effects of environmental problems and the policies and processes to reduce differences in who bears environmental risks."[5]
U.S. Environmental Protection Agency, Environmental Equity, Reducing RiskFor All Communities (1992)." It is irrefutable that the Site is in a neighborhood largely made up of low income and racial minority populations, and that the anticipated student population of the Springfield Street schools was expected to be a part of this demographic. The question is whether or not DEM has shown that it actually considered issues of environmental equity for these low income and racial minority populations as was required.
Clearly, DEM lacked any established policy or procedure for considering environmental equity issues: the term is not mentioned in the Remediation Regulations, and there is no evidence of any other published policy in effect at the time of the site remediation process. Yet, the IPRARA does not require DEM to develop and implement such policies or procedures, so the deficiency is not fatal to DEM's claim that it did consider environmental equity issues. On the other hand, such a void does not help DEM to show that the department did "think carefully about" the issues. Where, as here, not one of all the documents filed in connection with the site remediation process even mentioned "environmental equity," adherence to a standard procedure for considering the issue could have helped DEM to show that it did address the issue in some fashion.
Despite DEM's assertion that it recognized immediately that the Site was an "environmental equity" site and despite cursory reference to EPA maps containing demographic data showing the make up of the surrounding population, the handling of the site remediation process — applying the Residential Criteria as the proper regulatory standard, holding public meetings, even imposing substantial remedial components — does not lead to an inference that DEM considered issues of "environmental equity." Presumably, DEM would require at least as much effort and compliance if a school were proposed for a remediation site in any neighborhood, low income, minority or otherwise. Whether or not DEM's decisions and requirements for remedy were appropriate in this situation, they are not evidence, in and of themselves, that issues of "environmental equity for low income and minority populations" were considered. No other credible evidence was proffered to show that DEM did consider issues of environmental equity. Accordingly, this Court finds that the DEM violated the environmental equity provision of the IPRARA.
Community Involvement.
The Plaintiffs contend that DEM also violated Section 5 by failing to implement the mandatory community involvement process. The IPRARA requires that DEM ensure community involvement throughout the investigation and remediation process. Plaintiffs maintain that DEM failed to implement a public participation process that included the three statutory requirements outlined in Sections 5(a).
First, the Plaintiffs allege DEM did not ensure notification to abutting residents of the work plan proposal for the site investigation of the Site in accordance with Section 5(a)(1). Second, the Plaintiffs allege DEM did not make all the public records concerning the investigation and clean-up adequately available in accordance with Section 5(a)(2). The Plaintiffs contend DEM lacks a policy or practice for informing the public that it is reviewing a SIR and that DEM failed to inform anyone before April 9, 1999 that the SIR or RAWP were available or where the documents could be obtained. Third, the Plaintiffs' allege that DEM did not ensure that notification of the completion of the site investigation was timely given to abutting residents and other interested parties as required by Section 5 (a)(3). Plaintiffs maintain that the site investigation was deemed complete by DEM on April 9, 1999 with the issuance of the Remedial Decision Letter. The Plaintiffs contend the only notice sent to abutters — a one page flyer sent by the City regarding the April 26, 1999 meeting — was untimely and insufficient. The Plaintiffs maintain that the flyer was deficient in that it did not provide notification that the site investigation was deemed complete or information about the remedial alternatives proposed or how to review relevant documents. Additionally, Plaintiffs assert that DEM did not inform "interested parties" under Section 5(a)(3). Plaintiffs argue that DEM's failure to adhere to the community involvement mandate of IPRARA resulted in such a lack of information that interested parties were not able to come forward in time. Plaintiffs also claim DEM did nothing to affirmatively insure that attendants at the public meetings remained informed.
With regard to the notification requirements of Sections 5 (a) (1) and (3), DEM asserts that there is no specific statutory requirement governing the form of notice — printed, published, or otherwise; thus, the manner in which notice is given should be left to the sound discretion of DEM. DEM suggests that public participation opportunities were enhanced by sending DEM representatives to at least eight City Council and School Committee meetings where the Site was on the agenda for discussion, and by participating in ten public meetings relating to the City's plans to build schools at the Site.
More specifically, DEM counters that the exact notice requirements for Section 5(a)(1) — notice to abutting residents "when a work plan for a site investigation is proposed" — could not be met because of the timing of the determination that the Site was a jurisdictional hazardous waste site subject to the IPRARA. According to DEM, the timing disconnect results from the fact that Section 5(a)(1) is aimed at "brownfield sites" — sites known to be contaminated before a site investigation is begun and where the investigation is intended to determine the level of contamination. The initial investigation at the Site was conducted to determine if there was any contamination to be considered. In other words, the IPRARA did not yet apply because the Site was not yet known to be contaminated. Moreover, since the City did not file a work plan for a site investigation with DEM prior to commencing the site-work, DEM did not know the Site was a jurisdictional hazardous waste site subject to the IPRARA and could not ensure the notification of Section 5(a)(1). DEM maintains that the Site did not become jurisdictional under IPRARA until after the site investigation began; therefore, the initial notice required under Section 5(a)(1) was not legally required. DEM suggests that adequate public notice was provided through a March 16, 1999 public meeting held by the city, one week after the city notified DEM that the Site was, in fact, contaminated. Furthermore, DEM maintains it required that the City hold public meetings because DEM believed that meetings would provide the best mechanism for hearing and responding to community concerns.
With regard to the IPRARA's public record requirement in Section 5(a)(2), DEM argues that the statute was not violated because the Plaintiffs failed to show that anybody sought and was denied access to records. Moreover, the Department maintains that all records pertaining to the Site were available for review at DEM's main office in Providence.
Finally, DEM claims it exceeded the requirements of Section 5(a)(3) by requiring the City to conduct a final public hearing as a pre-condition to approval. This hearing was held on April 26, 1999. DEM claims, in addition to meeting the statutory notification requirement, this meeting provided an opportunity for public comment and public discourse with DEM officials and that notice of this meeting was provided to all appropriate parties. DEM argues that the IPRARA does not set a specific time frame for the Section 5(a)(3) notification and that the timing of this meeting, more than one month before DEM issued its final approval of the remedy, complies. DEM also maintains that no evidence was produced by the Plaintiffs establishing that any other non-abutting interested party identified itself to DEM or the City, and that none of the Plaintiffs testified that they notified DEM that they were "interested parties."
Section 5(a)(1).
While there was a regulatory process developed by which Section 5(a)(1) notification should occur, see CRIR 12-180-001 § 7.07A. ("Prior to the implementation of the Site Investigation field activities, the performing party must notify all abutting property owners and tenants that an investigation is about to occur."), the regulation was not followed during the investigation of the Site. It is undisputed that neither DEM nor the City provided the abutting residents or tenants with advance notice of when the work plan for the site investigation was proposed. The work plan was proposed sometime in early February and the public meeting allegedly held in satisfaction of this notice occurred on March 16, 1999.
The City announced its plans to build schools on the Site on or about February 10, 1999. In response to the City's announcement, and, more particularly, in response to the 2-3 daily telephone calls generated to DEM as a result of that announcement, DEM contacted the City on or about February 17, 1999 to report that the Department had records on file that the Site had formerly been used as a dump. The DEM records dated back to 1989 at which time investigators had discovered auto fluff containing PCBs at the Site. The City proceeded with site work and had the soil tested by a private company, ATC. On March 8, 1999 the results of ATC's testing revealed that the Site was contaminated. On March 10, 1999, after receipt of the ATC information, DEM instructed the City to prepare a SIR. This is the point at which DEM suggests the Site became jurisdictional under the IPRARA. On March 16, 1999, the Municipal Defendants held a public meeting at which the ATC data was discussed and which was attended by DEM personnel. At trial, evidence was not produced to show which and how many members of the public were present. DEM contends that notice about the work plan was conveyed at this meeting.
A site that is jurisdictional under the IPRARA is defined by the statute as follows:
 "all contiguous land, structures and other appurtenances and improvements on the land contaminated by the use, storage, release or disposal of hazardous material including the areal extent of contamination and all suitable areas in very close proximity to the contamination where it will be necessary to implement or conduct and required investigation or remedial action." Section 231-9.14-3 (N).
"Brownfields are defined by the EPA as ``abandoned, idled or underused industrial and commercial facilities where an expansion or redevelopment is complicated by real or perceived environmental contamination.''"Francis v. Buttonwoods Realty Co., 765 A.2d 437, 439
(R.I. 2001) (quoting United States General Accounting Office, Superfund: Barriers to BrownfieldRedevelopment, GAO/RCED-96-125 (June 17, 1996)). DEM's claim that the property did not fall under IPRARA jurisdiction until after the initial site testing, because it was not a designated brownfield property fails. Certainly, hindsight reveals that the property qualified as a site at all times relevant to this action because it was, in fact, contaminated. Moreover, the recorded history of PCB contamination, coupled with the outcry indicating a public perception of contamination, suggests that DEM should have assumed jurisdiction as soon as it became aware of the City's plans to redevelop the property and prior to any soil testing or site work. In order to "ensure community involvement throughout" the site investigation process, notification of the proposed work plan should have been given sooner — when the work plan for the initial site investigation was first proposed. Additionally, even if the timing had been correct, the public meeting of March 16, 1999 failed to fulfill the mandate of the statute. While the manner of notice may be discretionary because the statute does not say otherwise, the IPRARA is very clear as to who must be notified. If the notification about the work plan was imparted at the meeting, DEM would have had no way of knowing if the notice reached those statutorily required to receive it, the abutters. By failing to implement the regulatory process, failing to require the City to notify abutters in a timely fashion, DEM did not "ensure" that abutters were notified.
Section 5(a)(2)
Section 5(a)(2) adds another component to the process by which DEM must ensure community involvement. DEM must provide for "[a]dequate availability of all public records concerning the investigation and clean-up of the site, including, where necessary, the establishment of informational repositories in the impacted community." Section 23-19.14-5 (A). To understand what this command entails, the words must be read in light of their plain and ordinary meanings. Santos, 870 A. 2d at 1032. Records are "available" if they are "present and ready for use" or "accessible." The American HeritageDictionary of the English Language 123 (Houghton Mifflin 4th ed. 2000); see also Doran v. Petroleum Mgmt. Corp.,
545 F.2nd 893, 904 (1977) ("The `availability" of information means either disclosure of or effective access to the relevant information."). "Adequate" is defined as "sufficient to satisfy a requirement or meet a need." The American Heritage Dictionary at 21. The requirement that must be met pursuant to Section 5(a)(2) is to "ensure community involvement." Therefore, the statute requires that the public records be made accessible enough to "ensure community involvement." Clearly, establishment of informational repositories in the impacted communities provides prima facie effective access. Section 5 (a)(2). The issue here is whether or not the presence of the records at DEM's offices in Providence was sufficient to ensure the involvement of the community impacted by the Springfield Street site clean-up.
The documents were kept at DEM offices in Providence. There were no informational repositories set up in the impacted community. Information on the availability of the records was not offered until the April 26, 1999 meeting. A flyer sent out on April 9, 1999 announced the meeting and mentioned the existence of public records but did not state how such documents could be obtained and did not provide a contact name or number. Low income minority residents comprised most of the impacted community. Such citizens are generally not highly educated in the arcane workings of state agencies and, therefore, could be expected to require some clear direction as to how to access the relevant records. DEM's own argument suggests that the community did not gain access to the records in time to effectively comment on the proceedings: DEM was open to public comment at the April meeting, but while it heard general lamenting over the construction of schools on the Site, no substantive technical comments were elicited. Inadequate access to the relevant public records could explain the lack of substantive comments — the uninformed cannot effectively speak to specific technical issues. That the information was not sought after and denied does not tend to show that the information was adequately available, to the contrary, it demonstrates that the information was too unavailable to be sought after by members of the impacted community. The IPRARA requires informational repositories when necessary. Given the nature of the project (construction of schools) and the make up of the impacted community (low income and minority) the necessity for DEM to make some effort to provide effective access is apparent. Simply housing the documents at DEM headquarters was not enough to satisfy the statute.
Section 5(a)(3)
Finally, Section 5(a)(3) requires that "[n]otification to abutting residents, and other interested parties, when the investigation of the Site is deemed complete by the department of environmental management" be included as part of the community involvement process that must be developed and implemented. DEM developed a process that included such notification by promulgating Remediation Regulations §§ 7.07 and 7.09. Section 7.07B requires the performing party — in this case, the City — to both notify abutters and to provide them with findings:
 "When the Site Investigation is deemed complete, the Department will issue a program letter confirming that the performing party has adequately assessed the nature and extent of contamination at the contaminated site. Prior to the formal Department approval of the Site Investigation Report (in the form of a Remedial Decision Letter), the performing party must notify all abutting property owners, tenants and community well suppliers associated with any well head protection areas which encircle the contaminated-site that the investigation is complete and provide them with the findings of the investigation and any proposed remedial alternative which includes on-site treatment and/or containment of hazardous materials as part of the final remedy." CRIR 12-180-001 § 7.07B.
Moreover, section 7.09 requires more than mere notice when the remedial alternatives chosen will include onsite treatment or containment of hazardous materials:
 "All preferred remedial alternatives which include on-site treatment and/or containment of hazardous materials as part of the final contaminated-site remedy shall be subject to public notice as specified in Rule 7.07 (Public Notice), and shall be subject to public review and comment regarding the technical feasibility of such preferred remedial alternative prior to issuance of the Remedial Decision Letter." CRIR 12-180-001 § 7.09.
Despite the existence of these regulations, however, the process was not implemented during the Springfield Street Site investigation and remediation. When the site investigation was deemed complete, DEM issued a Remedial Decision Letter on April 9, 1999, which set conditions to be met before final approval. Among these conditions were the completion of the technical design plans and public notice and comment. DEM contends that the April 26, 1999 meeting provided both adequate notice and ample opportunity for comment. DEM also argues that since a final order was not issued until June 4, 1999, abutters and interested parties had more than a month to provide substantive technical comment after the April 26th meeting. Even if this Court allows for DEM to consider the term "Remedial Decision Letter" a misnomer because of the conditions attached (thereby transforming it into a "program letter") the manner of notification, solely via the April 26, 1999 public meeting, was insufficient to satisfy the statute's mandate. The abutters, even if they received the flier announcing the meeting, were not necessarily informed that a site investigation was deemed complete if they were not in attendance. Additionally, interested parties, "those who ha[d] a recognizable stake (and therefore standing) in the matter," Black's Law Dictionary 1144 (7th 1999), may not have even received the flyer to become aware of the meeting.
In summary, this Court declares DEM actions, but mostly inactions, with respect to approving the City's plans to construct the schools on the Site violated G.L. § 231-9.14-5. Specifically, DEM did not meet the environmental equity and community involvement requirements established by IPRARA Section 5(a).
 COUNT TWO: REMEDIATION REGULATIONS
Plaintiffs claim that Defendants violated various sections of the Remediation Regulations. For the purpose of addressing these claims, the allegedly violated sections can be divided into two categories: those regulations requiring notice to third parties, and those regulations requiring approval by DEM based on the context of the performing party's SIR and RAWP.
A. Notice Regulations
The facts relative to the notice regulations have been discussed in the preceding Count I, supra. Based on these facts, and the plain language of the regulation, this Court decided on summary judgment that the City had violated section 7.07 by failing to notify abutting property owners "prior to the implementation of the Site Investigation Field activities" and by failing to notify and provide necessary information to abutters when the site investigation was deemed complete. CRIR 12-180-001 § 7.07. Here, the Court further holds that the City violated section 7.09 by the same inaction attendant to the violation of section 7.07. Section 7.09 requires public notice and comment when the remedial alternative includes "onsite treatment and/or containment of hazardous materials." CRIR 12-180-001 § 7.09. Since the remedy at the Site included on-site treatment and/or containment of hazardous materials — the installation of a sub-slab ventilation system, capping of the soil in some areas and a soil gas ventilation system — section 7.09 applied. Despite this requirement, the City failed to timely notify even the abutting property owners, made no effort to supply pertinent information to the public on which substantive comment could be based, and did not even ensure that the public records were adequately available. The failure to properly notify and provide the necessary information as required in section 7.07 resulted in a failure to elicit the requisite substantive public review and comment.
Additionally, the Court holds that DEM likewise violated section 7.09 by issuing the Remedial Decision Letter in spite of the obvious lack of public comment. Section 7.09 requires that public comment be afforded prior to the issuance of the Remedial Decision Letter and specifically requires that "the decision regarding the appropriateness of a site remedy shall be based upon the information contained within the decision record for the contaminated site, and that the decision record shall include . . . B. [a] final response, approved by the Department, to substantive public comments." Id. In the instant case, the Department issued the Remedial Decision Letter without consideration of any final response to public comment (no such comment existed nor had any been solicited by the City or the DEM). Clearly, the Remedial Decision Letter was advanced without adherence to the Section 7.09 mandate.
B. Context Regulations
 1. Plaintiffs' Argument
The main thrust of Plaintiffs' argument relative to the remaining regulations is that Defendants' failure to adhere to them resulted in implementation of an inadequate site investigation and remedy. The first specific violation complained of is DEM's failure to issue a program letter as required by Regulation 7.07 B, thereby allowing an incomplete characterization of both the horizontal or vertical extent, on and through the Site, of any potential chemicals or compounds of concern.
Plaintiffs also assert that sections 7.0 and 8.0 were violated by the Municipal Defendants in pursuit of the site remediation process, and that sections 7.0, 8.0, and 9.0 were violated by DEM for approving the actions of the Municipal Defendants in pursuit of the site remediation process. The allegedly violative actions of the Municipal Defendants include use of improper engineering and scientific judgment in characterizing the geology and lithology of the Site, failure to test for the presence of certain hazardous and toxic substances known to be or highly likely to be at the Site, failure to conduct scientifically adequate testing to determine the location, nature, extent, and migration of hazardous and toxic substances on the Site, and failure to propose and implement the remedy that is most protective to human health and the environment.
Specifically, the Plaintiffs claim Remediation Regulation section 8.02 requires that contaminated soil be remediated in a manner which meets the direct exposure and leachability criterion for "each hazardous substance established in Rule 8.02B (Method I Soil Objectives: Tables 1 and 2)." CRIR 12-18-001 § 8.02B. Tables 1 and 2 (the Direct Exposure Criteria for Soil and the Leachability Criteria) list several known substances and set the maximum amount of each that may safely be present for either residential exposure or industrial/commercial exposure, with the former generally amounting to a much smaller amount than the latter. There is no dispute that several substances listed, including many under the category of "metals" and whole categories of substances, such as pesticides and semi-VOCs, were not tested for as part of the City's site investigation. The Plaintiffs assert that unless a substance is tested for, it cannot be determined whether concentrations existed in excess of the Table 1 and 2 standards. Therefore, Plaintiffs argue that the SIR was incomplete under Remediation Regulations sections 7.04A (Site Investigation Report must contain documentation of compliance with Section 8) and 7.08 ("A completed Site Investigation Report must contain all the information set forth in Rule[s] 7.04 . . . as necessary and appropriate"). Accordingly, Plaintiffs assert that the remedy, which was based on this incomplete site investigation, is inadequate.
Plaintiffs further contend that given the past use of the Site, even if the Remediation Regulations did not explicitly require testing for the presence of all of the substances listed, "sound professional judgment," pursuant to section 7.03, dictated the necessity of testing for those substances. The Plaintiffs point out that there were no historical restrictions on what could have been disposed of at the Site, so any kind of waste could have been deposited. Therefore, sound judgment — and common sense — would require testing for a greater number of substances.
Specifically, Plaintiffs' expert, Christine Pollock (Pollock), testified that the following substances should have been tested for: thirteen priority pollutant metals, metals base neutral extract table compounds, pH, PCBs, pesticides, and herbicides. Pollock further suggested that tests should have been taken for such hazardous characteristics as toxicity, corrosivity, reactivity, and ignitability. Claiming that Defendants' remedy failed to address many possible contaminants that were not discovered, Plaintiffs' argument can be summed up as follows: "the absence of evidence of harm is not the same thing as evidence of the absence of the harm." Morrillo-Frosch, Pastor Sadd,Integrating Environmental Justice and the Precautionary Principle inResearch and Policy Making: The Case of Ambient Air Toxics Exposures andHealth Risks Among Schoolchildren in Los Angeles, 584 Annals 47, 50 (2002) (internal citations omitted).
Given the greater susceptibility of minority school age children in Providence to the harmful effects resulting from exposures to contamination, as established by the testimony of Plaintiffs' expert Dr. Mitchell, and the lack of data about the nature and extent of such contamination at the Site, the Plaintiffs argue that the most conservative and protective remedy available should have been implemented. Plaintiffs suggest that a RCRA cap, the "presumptive remedy" for closing an unengineered landfill under Rhode Island's Solid Waste Regulations, was the most conservative and protective remedy available and that such should have been used in lieu of the cover consisting of two feet of clean fill that was implemented. Accordingly, the Plaintiffs ask this Court to declare that DEM and the Municipal Defendants failed to comply with DEM's Remediation Regulations when the Municipal Defendants applied to DEM for permission to construct the schools on the Site.
2. Defendants' Argument
As for the lack of a program letter, DEM concedes that it did not issue one, as was required by the plain language of Remediation Regulation § 7.07B; however, DEM urges this Court to consider the April 9, 1999 Remedial Decision Letter, as fulfilling this requirement; and the June 4, 1999 Order of Approval as fulfilling the requirement of the Remedial Decision Letter.
As for the adequacy of the site investigation and the approved remedy, DEM adamantly defends both. The Department argues that no evidence was presented to show that the approved remedy was inadequate to protect the users of the Site from direct exposure to the kinds of hazardous materials known to be present at the Site. DEM also points out that Section 7.01 provides that the site investigation process is discretionary on behalf of the Director of the Department. CRIR 12-18-001 § 7.01 ("The Director may require . . . an investigation" (emphasis added)). Likewise, DEM contends that the identification of the list of contaminants to be tested at a site is also discretionary and left to the "best professional judgment" of an applicant's experts and DEM's staff. DEM does not require that each of the substances listed in the exposure tables be tested in every case. Rather, experts determine which substances to test for based on the history of the site and other pertinent data consistent with their sound professional judgment. Furthermore, DEM maintains that the Springfield Street Site investigation was abundantly protective even though every substance mentioned in § 8.02B was not tested for, because all subsurface media — including soil, groundwater, and soil gas — were appropriately tested for contaminants. DEM argues that the testing that was done was adequate to ensure the development of a remedy at the Site that would be protective of all known and reasonably foreseeable contaminants.
Specifically, DEM contends it was not required to do additional testing of contaminant metals or landfill gases. Jeffrey P. Crawford, then a principal environmental scientist at DEM, testified at length that additional metals were rarely encountered in Rhode Island, and when they were, they were associated with specific activities that were not known to have occurred at the Site. Moreover, Crawford testified that when hazardous levels of metals, such as lead and arsenic, were discovered, the remedy implemented, capping the Site, eliminated direct exposure of other such metals; thus, additional testing for other metals was unnecessary.[6] In addition, testing for landfill gases, volatiles or semi-volatile organic compounds ("VOCs" or "SVOCs") in soil and groundwater also became unnecessary because the remedy included soil vapor extraction and monitoring systems to check and prevent harmful vapors from entering the school buildings. This remedy, according to Crawford, removes all vapors, not just those tested for during the investigation.
DEM also maintains that the groundwater at the Site was found to be within the appropriate classification for the Site and the entire surrounding area, and, since the groundwater quality on-site was compliant with the groundwater classification for the surrounding areas, no groundwater remedy was required. DEM believed there was no reason to perform a detailed study of groundwater flow, to map groundwater contours, or perform fate and transport models.[7] There was no evidence that contamination at the Site was a threat to surrounding properties. Moreover, DEM points out that the groundwater at the Site was observed to be between 6.5 and 17.8 feet below grade during the site investigation (before the 2-foot soil cap was applied to the Site), which is not a direct contact threat.
Furthermore, DEM declares that the requirements of the Remediation Regulations were actually exceeded by requiring independent exposure criteria for gasses or vapors. The Remediation Regulations, as then constituted, only required a site to be characterized for contaminants in soil and groundwater. The regulations contained no independent exposure criteria for gasses or vapors which might be found within the soil. However, since soil gasses are a known to be a by-product of the decay and decomposition of garbage, DEM requested a soil gas study at the Site. The City collected soil gas samples at twelve sampling points that were primarily located in the footprint of the middle school building, where the waste was deepest and was proposed to be contained on-site. The soil gas study evaluated both "landfill gasses" (methane, carbon dioxide, oxygen) and a number of VOCs and SVOCs. Lacking Rhode Island promulgated regulatory standards with which to evaluate such contaminant levels in soil gas, DEM and the City agreed to use residential "volatilization" criteria from Connecticut to evaluate the VOCs and SVOCs in soil gas at the Site.
The results of these analyses showed no violation of the Connecticut standards. In fact, analyses of landfill gasses showed no or low concentrations of methane and high concentrations of oxygen. Given these results, the City's consultants concluded that high concentrations of oxygen were evidence of aerobic decomposition that would minimize the potential for methane to become a health or safety threat for the schools. Combined with the fact that Rhode Island lacks any enforceable standards for soil gases, DEM asserts that these low risk analytical results could easily have been interpreted to mean that there was no need for any remedial action with respect to soil gas. Nonetheless, due to the history of the Site, the sensitive nature of the Site's proposed use (schools), and the obvious difficulties inherent to retrofitting the school buildings with sub-foundation vapor removal systems if soil gases were found to be a problem in the future, DEM required that soil gas monitoring and abatement be included as part of the remedy.
Accordingly, not only were each of the buildings constructed with sub-foundation soil vapor extraction systems to prevent soil gases from entering into the buildings, the entire Site was ringed with soil sentinel wells to monitor trends in soil gases. These perimeter wells not only have a monitoring function, but they are also capable of being interconnected and vented to provide extra soil vapor extraction capabilities if they are required at the Site. Thus, DEM argues its remedy utilized the most protective criteria available and appropriate — beyond the Department's strictest regulatory standards.
Finally, DEM argues that the Plaintiffs have failed to show any damage. DEM admits there were some intermittent, short-term problems associated with dust and odors; however, DEM maintains these temporary nuisances were vastly outweighed by the positive environmental consequences flowing from the investigation and remediation of a previously uncontrolled, abandoned dumpsite. More importantly, DEM points out that the Plaintiffs have provided no evidence of negative environmental consequences, actual health impacts from exposure to contaminants emanating from the Site, which can be traced to an inadequate remedy approved by DEM.
The City concurred with DEM, maintaining that the schools are environmentally safe and that the site investigation was adequate. At trial, the City provided two witnesses whose opinions were based on uncontested data and reports.
Timothy O'Connor (O'Connor), a registered professional engineer and Director of Environmental Services for a civil engineering firm, was qualified as an expert in the investigation and remediation of hazardous materials and sites in Rhode Island, as well as the occurrence and geochemistry of metals in Rhode Island soil. He rendered an expert opinion as to a reasonable degree of scientific certainty that the scope of the site investigation was tailored to the specific conditions and circumstances at the Site using the best professional judgment required in Remediation Regulation § 7.01 ("The scope of the Site Investigation shall be tailored to specific conditions and circumstances at the site under investigation.") and that the site investigation was conducted in a manner that facilitated selection of a remedy for the Site pursuant to the same regulation. He testified that the Site is in an urban area where groundwater is not used as drinking water and noted that the site investigation found no exceedance of standards for any media other than soil. He added that he was aware that autofluff had once been present at the Site and that industrial waste had also been deposited there. He also admitted that some materials, such as some metals not among the "RCRA 8," the groundwater, or the PH in the soil, had not been tested for; however, he testified that it is not the industrial standard to test for such materials when investigating municipal landfills. O'Connor also noted that DEM had never rejected a site investigation or RAWP that he had helped to prepare. Most importantly, O'Connor testified that the remedy would not have changed even if the additional materials had been found at the Site. He explained that such contaminants are not mobile in the environment and there would not be a concern about them "dissolving into groundwater and moving very far," especially in an area such as this Site "where no one is drinking the water" and said groundwater is "10 to 12 feet below the surface" and "cannot flow to the surface."
The City's other expert was Dr. John Collins (hereinafter "Collins), a PhD and chief scientist at Vanasses, Hangen, Brustlin, Inc. (who conducts "risk assessments" — discipline dealing with making decisions about hazardous waste sites). Having worked on between 50-200 uncontrolled landfills in 40 different states, and having previously performed risk assessments on populations consisting of elementary and middle school age children, he was qualified as an expert in "risk assessments on hazardous waste sites" and stated that the industry standards in Rhode Island for his area of expertise are enumerated in Section 8 of the Remediation Regulations. He was very familiar with the SIR, RAWP, monitoring reports, nurse's logs, and deposition and trial testimony of Plaintiffs' experts. Collins testified that the remedial objectives and soil objectives in the SIR and RAWP "are protective of human health and the environment." He also determined that the groundwater objectives in the SIR and RAWP were likewise protective. Furthermore, Collins testified that not all of the substances in § 8.02B presented a risk of harm to humans. He did not agree that testing for pesticides at the Site should have been performed. He agreed that the levels of lead found at the Site exceeded the Direct Exposure Criteria, but stated, "I know that lead is not moving across the site" and the risk of it to humans is "extremely low." He also had a high degree of certainty that "the groundwater is not coming to the surface." In his expert opinion, there was no significant health risks presented by the remedy regarding action levels for carbon monoxide and carbon dioxide that were detected in the soil gas removal system at the schools. He testified that the remedy was designed to protect against all of the potential contaminants; therefore, separate tests for cyanide, beryllium, copper, manganese, nickel, or zinc were unnecessary. He also opined that lead was not important regarding groundwater because there would not be a great deal of mobility with the levels present. He further testified that the exceedance of action levels for carbon dioxide did not change his opinion. Finally, he explained that the remedy chosen prevents exposure of any contaminants, so it is not necessary to establish the presence, or absence, of each.
3. Analysis
The question is whether or not the actions taken by the City in determining the scope of the investigation (what substances to test for and what remedy to apply) fulfilled the requirements of the Remediation Regulations. Since DEM sanctioned the City's actions, the ultimate issue to be decided is whether, in so doing, the Department properly interpreted its own regulations. "An agency's interpretation of its own regulation is due great deference." Massachusetts v. Hayes, 691 F.2d 57, 62 (1st Cir. 1982) (citing Udall v. Tallman, 380 U.S. 1, 16,13 L. Ed. 2d 616, 85 S. Ct. 792 (1964)); see also State v. Cluley,808 A.2d 1098, 1103-04 (2002) (court held that it was error to substitute for a definition used by a governmental agency in the application of its own regulation because agency was due deference and agency's interpretation was not plainly wrong). Moreover, DEM's interpretation "is `of controlling weight unless it is plainly erroneous or inconsistent
with the regulation.'" Hayes, 691 F.2d at 62 (1st Cir. 1982) (quotingBowles v. Seminole Rock Co., 325 U.S. 410, 414, 89 L. Ed. 1700,65 S. Ct. 1215 (1945)).
Even allowing for deference to the Department, the conceded lack of a Program Letter cannot be remedied by renaming and substituting documents because such action would clearly be inconsistent with the Remediation Regulations. Particularly problematic would be the Department's designation of the June 4, 1999 Order of Approval as the Remedial Decision Letter. As explained in Section 2.02 of the Remediation Regulations, the Order of Approval is itself a required document which approves the technical details of implementing the remedy as laid out in the RAWP. See also CRIR 12-180-001 § 10.01. Accordingly, this Court holds that DEM violated § 7.07B by failing to issue the Program Letter.
On the other hand, the plain language of the Remediation Regulations supports DEM's contention that site investigations are generally discretionary. Therefore Plaintiffs' claim that Defendants had an explicit obligation to test for each of the § 8.02B substances fails. Section 7.01 provides that the Director of DEM "may require a performing party for any contaminated-site to conduct, in a specified amount of time, an investigation of the contaminated-site to adequately assess the nature and extent of the contamination, and to evaluate and design a proposed remedy." CRIR 12-180-001 § 7.01. This regulation also provides that such an investigation "must determine the nature and extent of the contaminated-site and the actual and potential impacts of the release;" however, "the scope of the [s]ite [i]nvestigation shall be tailored to specific conditions and circumstances at the site under investigationusing professional judgment." Id.
While the Remediation Regulations provide specific perimeters for a site investigation, and § 7.03 lists twenty-three elements that shall be considered in the site investigation report "as appropriate," the last factor provides that "[a]ny other site-specific factor that the Director has reason to believe is necessary to make an accurate decision as to the appropriate remedial action necessary to be taken at the contaminated-site." Id. § 7.03(W). In general, these factors include a description of the contamination, a characterization of the property surrounding the affected area, classifications and testing of area impacted, and procedures to remediate the site. The plain language of the regulations makes clear that testing for the presence of all substances listed in Table 1 is not mandatory. Rather, "sound professional judgment" dictates the scope of the examination. Id. § 7.03.
The issue, then, is whether or not "sound professional judgment" was employed in the investigation of the Site. Put another way, did DEM properly interpret the requirement of "sound professional judgment" to conclude that it was exercised by the City in investigating and implementing a remedy at the Site? This Court answers in the affirmative.
In the first place, Crawford's testimony was convincing as to why certain testing was not conducted. Crawford testified at length that those metals not tested were rarely encountered in Rhode Island. He also explained that they were associated with specific activities that were not known to occur at the Site. Moreover, Crawford's testimony that capping the Site eliminated direct exposure to, not only the lead and arsenic known to be at hazardous levels, but also other such metals, was a sound explanation as to why it was unnecessary to commit to additional testing. Similarly, the evidence showed that additional testing for landfill gases, volatiles or semi-volatile organic compounds ("VOCs" or "SVOCs") in soil and groundwater was likewise unnecessary because the remedy included soil vapor extraction and monitoring systems to check and prevent all harmful vapors from entering the school buildings.
DEM presented scientific data establishing that the groundwater at the Site was within the appropriate classification, according to established criteria applicable to the Site and the surrounding area. Therefore, no groundwater remedy was required. See note 7, supra. The evidence did not show that contamination at the Site threatened to degrade environmental conditions on surrounding properties.
Furthermore, the remedy applied exceeded the requirements of the applicable Remediation Regulations. While the Remediation Regulations, only required the Site to be characterized for contaminants in soil and groundwater, a soil gas study was also performed at the Site. The soil gas study evaluated both "landfill gasses" (methane, carbon dioxide, and oxygen) and a number of VOCs and SVOCs. The results of these analyses showed no violation of the standards that were applied. (Connecticut standards were applied because there were no established standards in Rhode Island.) Also, analysis of landfill gasses showed no or low concentrations of methane and high concentrations of oxygen.
Exercise of "sound professional judgment" could reasonably have resulted in a determination that there was no need for any remedial action with respect to soil gas, but DEM still required that soil gas monitoring and abatement be included as part of the remedy due to the history of the Site, the sensitive nature of the Site's proposed use (schools), and the obvious difficulties inherent to retrofitting the school buildings with sub-foundation vapor removal systems if soil gases were found to be a problem in the future. Each of the buildings was constructed with sub-foundation soil vapor extraction systems to prevent soil gases from entering into the buildings, and the entire Site was ringed with soil sentinel wells to monitor trends in soil gases. These perimeter wells not only have a monitoring function, but they are also capable of being interconnected and vented to provide extra soil vapor extraction capabilities if they are required at the Site. This evidence supports a finding that the remedy applied utilized the most protective criteria available and appropriate; and, in fact, that the remedy went beyond the strictest regulatory standards.
This Court also found the City's two experts, O'Connor and Collins, most creditable. O'Connor explained that the applicable groundwater standards were premised on the fact that the Site was located in an urban area where the groundwater was not used as drinking water. He recognized that some materials had not been tested for — such as some metals not among the "RCRA 8," the groundwater, or the PH in the soil — and explained that it is not the industry standard to test for such materials when investigating municipal landfills. Significantly, he provided credible testimony that the ultimate remedy would not have changed even if these materials had been discovered because they are not mobile in the environment.
Collins, who was very familiar with the SIR, the RAWP, the monitoring reports, the nurse's logs, and the deposition and trial testimony of Plaintiffs' experts testified that the remedial soil and groundwater objectives in the SIR and the RAWP were protective of human health and the environment, even considering the sensitivity of the school age children. He further added that not all of the substances in Table 1 presented a risk of harm to humans if they were exposed to them. He testified that the remedy was designed to protect human health and the environment from all of the potential contaminants and did not require identifying the levels of cyanide, beryllium, copper, manganese, nickel, or zinc because other contaminants of potential concern had been found. He particularly noted that lead was not important regarding groundwater because there would not be a great deal of mobility with the levels present.
Conversely, no evidence was presented to show that the remedy approved was inadequate. Despite Plaintiffs' premise that lack of evidence of contamination does not amount to lack of contamination, Defendants' experts adequately explained that the chosen remedy protected against all of the potential contaminants contemplated by the regulations. SeeCluley, 808 A.2d at 1105 ("[P]roper judicial deference to [agency's] interpretation of its regulations required the [Court] to presume the validity and reasonableness of that construction until and unless the party challenging its interpretation proved otherwise."). Even allowing for the extra sensitivity of minority school age children, additional discoveries of contamination would not have led to a different remedy under the Remediation Regulations. Therefore, Plaintiffs failed to establish that Defendants failed to use "sound professional judgment" in designing and implementing a remedial plan for the Springfield Street Site. There is no evidence that the community surrounding the Site has been required to bear a disproportionately negative environmental burden as a result of the remediation of the Site, aside from the intermittent, short-term problems associated with dust and odors which DEM fully acknowledges and which do not rise to violations of the Remediation Regulations on the adequacy of the site investigation or the adequacy of the remedy applied. Additionally, the remedy includes continuous monitoring, and as of the date of trial, no serious problems have yet to be reported. Accordingly, this Court finds that the Remediation Regulations relative to the adequacy of the site investigation and remedy selected were not violated by the Defendants.
 COUNTS III and V
Count III of Plaintiffs' amended complaint alleged violations of §§ 601 and 602 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d etseq., and the regulations promulgated under § 602, which Plaintiffs claimed were all actionable pursuant to 42 U.S.C. § 1983. This Court granted summary judgment to DEM as to § 1983 and to all of the defendants as to § 602 of Title VI and the regulations promulgated thereunder. The Court allowed the Plaintiffs to proceed against the Muncipal Defendants pursuant to § 1983 and against all of the Defendants pursuant to a direct cause of action under § 601 of Title VI.[8]
Since § 601 of Title VI prohibits "only those racial classifications that would violate the Equal Protection Clause," Regents of the Univ. ofCalifornia v. Bakke, 438 U.S. 265, 287 (1978), the two Counts, III and V, stand or fall together. Id.
 SECTION 1983 AND THE MUNICIPAL DEFENDANTS
Section 1983 provides as follows:
 "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.
In 1978, the United States Supreme Court held that municipalities were amenable to suit under § 1983, concluding that municipalities are suable "persons." Monell v. Dept. of Social Services of the City of New York,436 U.S. 658, 690 (1978). Accordingly, municipalities "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Id.
Specifically, municipal liability may be imposed "when execution of a government's policy or custom, whether made by its lawmakers or by those whose acts or edicts may fairly be said to represent official policy, inflicts the injury." Id. at 694.
Post-Monell, United States Supreme Court case law detailed the requisite steps to proving municipal liability under § 1983. See SingleHiring Decisions and Municipal Entities: The United States SupremeCourt's Latest Safeguard Against Municipal Liability Under42 U.S.C. § 1983, note, 20 U. Ark. Little Rock L.J. 327, 338-339 (Winter 1998) (discussing the development of law under § 1983). The Supreme Court determined that single acts by officials could constitute official policy for purposes of municipal liability. Pembaur v. City of Cincinnati,475 U.S. 469, 485 (1986). A plurality of the Court in Pembaur held that a single decision to follow a course of action, when made by the official with final authority to establish policy in that aspect of the municipality's business, could subject a municipality to liability under § 1983. Id. The Court noted that the final authority to establish policy could be derived from a legislative enactment or through a delegation from another official policy maker. Id. at 483. The Pembaur plurality directed lower courts to look to state law to determine whether an official possessed such final authority. Id. at 483.
Later, in City of St. Louis v. Praprotnik, 485 U.S. 112 (1988), a plurality of the Court followed Pembaur — holding that state law determines who are the policymakers for § 1983 municipal liability — and went further, finding state law to be the sole source for such an authority determination. Id. at 124-25. The Praprotnik court also stated that if "authorized policy makers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." Id. at 127. "The `official policy' requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipality liability is limited to action for which the municipality is actually responsible." Pembaur, 475 U.S. at 480.
Plaintiffs argue first that Sepe, acting in his official capacity as Acting Director of the DPP, had final decision-making power pursuant to Providence Home Rule Charter § 1006 which conferred authority in the Director's office to plan and construct City owned buildings such as public schools. The Plaintiffs argue that Sepe's actions constitute "policy," in that they clearly constituted "a specific decision or set of decisions designed to carry out [such] a chosen course of action," seeid. at 481 n. 9, which was the construction of the schools on the Site. The Plaintiffs point to the language of § 1006 of the Charter which provides in pertinent part:
 "There shall be a department of public property, the head of which shall be the director of public property. . . . The department of public property shall have jurisdiction over all land owned by the city . . . and over all . . . structures owned by or under the control of the city, and shall be responsible for the maintenance, planning, design, construction, alterations and repairs to all such city property under its jurisdiction . . . The department of public property shall also be responsible . . . for all purchasing and procurement of materials, supplies, contractual services, equipment and all other necessary categories of procurement for the City." Providence Home Rule Charter § 1006 (1980).
The Plaintiffs also point to language in the Charter that empowers the Director of the DPP to "make such rules and regulations as may be necessary to carry out the responsibilities imposed upon the department." Id.
Furthermore, Plaintiffs note that the Charter was "adopted by [its] city voters and ratified, confirmed and validated by the General Assembly" and as such constitutes state law. City of Providence v. EmployeeRet. Bd. of City of Providence, 749 A.2d 1088, 1098
(R.I. 2000).
Plaintiffs cite to five actions taken by Sepe in his official capacity as the highest official of the DPP which are alleged to have violated Plaintiffs' constitutional rights to equal protection and due process under the Fourteenth Amendment to the U.S. Constitution: (1) rejecting three sites and presenting only one site to various City officials for the construction of the schools; (2) sending bulldozers to the Site without notifying abutters and before obtaining regulatory approval; (3) successfully asking DEM to expedite its review of the City's site investigation and RAWP; (4) starting construction of the schools without first obtaining approval from DEM or obtaining necessary foundation and construction permits, and without taking ownership of the Site; and (5) providing inadequate notice to abutters of the Site as required by the IPRARA and the Remediation Regulations.
The City counters that Sepe, in his capacity as acting director of the DPP, was not a policymaker subjecting the City to municipal liability under § 1983. The Municipal Defendants cite to Sean Patrick v. City ofProvidence, C.A. No. 96-689L, United States District Court for the District of Rhode Island (April 24, 1998), to support their argument. Sean Patrick involved the Police Chief stationing a group of police officers outside of a nightclub, ostensibly framing a "policy" in response to a particular circumstance. The court held that the City was not liable under § 1983 because the policy was not promulgated by its highest authority in the City of Providence — the Mayor and the City Council. The Municipal Defendants analogize the Police Chief's decision to station police officers outside a club to Sepe's decision to site the schools and suggest that neither action constitutes a policy of the City. The Municipal Defendants assert that all city departments, such as the police department and the DPP, are subject to the legislative power of the City Council. See Ret. Bd. of Employees Ret. System ofProvidence v. City Council of Providence, 660 A.2d 721,728 (R.I. 1995).
The Municipal Defendants further discredit the Plaintiffs' reliance upon Home Rule Charter § 1006 by suggesting that, on its face, it severely limited Sepe's authority. By way of example they point out that subsection (c) only empowered Sepe to award bids of less than two thousand dollars. They note that Sepe had no authority to award bids over two thousand dollars, which would leave him quite shy of the power, or final policy making authority, to award the bids necessary to carry out a construction project of this magnitude. Therefore, the Municipal Defendants argue that the limitations on Sepe's power foreclose the possibility of his being deemed a final policy maker.
Examination of the Home Rule Charter reveals that the DPP "is responsible for the maintenance, planning, design, construction, alterations and repairs to all such city property under its jurisdiction," but that the Department's purchasing and sales functions are limited by deference to the City Council and the Board of Contract and Supply. Providence Home Rule Charter § 1006 (a) 1 and 2. However, the Home Rule Charter does not speak to the function underlying this claim, the function of choosing a site upon which to build schools, either to grant that authority or to curtail its scope. SeePembaur, 475 U.S. at 486 (J. White concurring). Therefore, a determination of whether or not Sepe had final authority in the site selection process cannot be resolved solely by reference to the Charter. Indeed, the Charter leaves open the scope of the Director's responsibility. Providence Home Rule Charter § 1006 (a) 9 (the Director is "responsible for all other functions and duties which are or shall be hereafter assigned to the department").
Additionally, defendants' reliance on Sean Patrick is misguided. First, as an unpublished order, it has no precedential value. See note 8, supra. Second, the Home Rule Charter explicitly vests policy making authority for police functions with the Commissioner of Public Safety and not with the Police Chief whose tortuous conduct gave rise to the complaint in that action. See
Home Rule Charter § 1001. Also, factually, a decision to conduct a single evening long stake out is clearly distinguishable from the decision to permanently construct schools for a particular segment of the City's population in that its occurrence would be less likely brought to the attention of other City officials for timely approval or disapproval. Therefore, this Court must look further to determine whether or not state law granted Sepe final policy making authority with respect to the siting of the Springfield Street schools. SeePraprotnik, 485 U.S. at 125-27 (authority may be granted legislatively or by delegation or ratification).
In the fall of 1998 the Providence School Department notified Sepe, as Acting Director of the DPP, that there was a need for schools in the Silver Lake area of Providence. Thereafter, Sepe called the Planning Department to see if there were any available buildings or land in the Silver Lake area of Providence. Sepe testified that he then identified four possible sites from a list of properties from the Planning Department: (1) Neutaconcanut Park, (2) Almacs on Plainfield Street, (3) Merino Park, and (4) the Springfield Street Site.
The evidence also revealed that the initial determination to locate the schools on the Site was made by Sepe. After some investigation, he decided not to build on the Neutaconcacut property because of a deed restriction; not to build on the Almac site based on the recommendations of people in the construction industry, including architects and others; and not to proceed on the Marino Park site because of wetland issues, environmental issues relating to the Woonasquatucket River, and a lengthy permitting process. Clearly, these actions by Sepe were conducted pursuant to his authority under the City's Home Rule Charter as functions assigned to the department.
The evidence also revealed that, at Sepe's instruction, the City sent bulldozers to the Site on March 6, 1999 to clear trees and vegetation, despite the fact that the City did not yet own the property, nor possess a building permit and without warning abutting residents. On March 15, 1999, the City's Board of Contract and Supply awarded a contract to O. Ahlborg 
Sons, Inc. for construction management and building design services for the proposed schools. On March 16, 1999, a meeting about the school construction proposal, with ATC and City Council member Igliozzi presiding, was held at the Silver Lake Community Center. Once the City submitted its site investigation and RAWP to DEM for approval Sepe asked DEM more than once to expedite its review of the Municipal Defendants' site investigation report and RAWP. By April 26, 1999, the City had incurred expenses on the schools project in an amount of $300,000 and $400,000. By May 6, 1999, the same day the City applied for a building permit, and prior to DEM approval of the City's RAWP, part of the foundation of the elementary school building had already been poured and piles were driven to support a school building. It was not until June 15, 1999 that the City took title to the land, by which time construction on both school buildings was well underway.
To finance the construction of the schools, the PPBA had to issue bonds. The process for issuing bonds involved the then-Mayor of Providence, Vincent Cianci, who requested by letter, dated March 1, 1999, that a certain amount of money be borrowed through the PPBA. Before the PPBA could issue these bonds, the plan needed both the Providence School Board and City Council's approval. On April 8, 1999, the Providence City Council passed a resolution authorizing the issue and/or requesting the PPBA to issue bonds for the Springfield Street schools.
On April 8, 1999, the Providence City Council approved then-Mayor Cianci's proposal to permit the PPBA to issue bonds to finance the construction of the school complex at the Site. On or about May 10, 1999, the Providence School Board voted 7-1 to approve the issuance of bonds to finance construction of the schools. On May 18, 1999, the PPBA took several votes relating to the Site. First, it voted to purchase environmental liability insurance for the school buildings. Second, it voted to include the costs of environmental monitoring and remediation as part of the basic rent to be paid by the City when the City leased back the school buildings from the PPBA. Third, it voted to issue bonds to finance construction of the schools.
On July 13, 1999, the PPBA voted to purchase a 10 year $50,000,000 pollution and remediation liability policy for the schools, and to establish an environmental reserve account for the schools to be funded by the City with annual payments of $40,000, until the account reached $200,000. The bonds approved by the PPBA for the schools included $11,400,000 for the costs of the Springfield Street Elementary School Project and $19,007,600 for the Springfield Street Middle School Complex.
The question to be decided is whether Sepe's allegedly unconstitutional acts can be attributed to the City itself rather than to Sepe in his capacity as an employee, to ensure that liability is not based on respondeat superior. See Monell, 436 U.S. at 691. Clearly, the overarching "course of action" taken by Sepe, choosing the Site, is attributable to the City itself, and the fact that the decision to do so was made by Sepe, coupled with the authority vested in his office by the Home Rule Charter, suggests that he had the requisite "final policy making" authority. In fact, the evidence establishes that his decision to eliminate the other potential sites was never questioned by any other official, even though the construction of the new schools constituted a substantial investment by the City, which indicates that his "final policy making" authority was universally accepted by other city officials. In the alternative, despite the asserted limitations on Sepe's spending power, those other official policy makers — the PPBA, the City Council, the Mayor, and the Board of Contract and Supply — who may have actually retained that power, can fairly be said to have ratified the decision by their own actions. It would be disingenuous of the City to now claim that it had not adopted the "policy" of choosing the Site, when they have for years been utilizing the schools located there. Particularly illuminating is the PPBA's decision to purchase pollution and remediation liability insurance, which shows that the PPBA was aware of the potential problems but chose to proceed with the course of action chosen by Sepe. Likewise, the expeditious nature in which the schools were constructed, despite legal impediments that would likely delay a project in the normal course of events — lack of DEM approval, lack of ownership, lack of a building permit — support a finding that Sepe was delegated the authority to create the final city policy in matters concerning the construction of these schools. Unlike, the Sean Patrick
police chief, Sepe's final policy making power was repeatedly reinforced by other officials who enabled Sepe to proceed in such rapid fashion. Accordingly, this Court holds that the City is amenable to suit under § 1983 for the alleged constitutional violations of its official, Sepe.
 THE APPLICABILTY OF THE SOLID WASTEREGULATIONS
In overseeing the remediation of the Site, it is uncontroverted that DEM applied the Remediation Regulations promulgated under IPRARA. Plaintiffs contend that this choice resulted in application of a less protective remedy than that which should have been required pursuant to the Solid Waste Regulations. The Solid Waste Regulations were promulgated by DEM pursuant to G.L. 1956 §§ 23-18.9-8 and 23-18.9-9, as amended, and proscribe the method for closing Solid Waste Facilities. Therefore, whether or not the Site should have been classified as a solid waste facility subject to closure under the Solid Waste Regulations is a question of law which bears on Plaintiffs' claim of intentional discrimination under Section 601 of Title VI, the Equal protection Clauses of the Fourteenth Amendment of the United States Constitution, and Article 1, Section 2 of the Rhode Island Constitution.
Plaintiffs contend that the Site qualifies as a solid waste management facility as that term is defined in the Solid Waste Regulations because at least three cubic yards of solid waste were, and are, present at the Site. CRIR 12-030-021 § 1.3.123 ("[A]ny property owner is considered to be operating a solid waste management facility if an amount of solid waste greater than three cubic yards exists on their property.") Therefore, Plaintiffs contend that the City violated the Solid Waste Regulations, and that such violation was subject to an administrative penalty up to $25,000 per day. CRIR 12-030-021 § 1.6.10. Additionally, Plaintiffs contend that the Site was subject to the preferred and most protective remedy for closing a landfill in Rhode Island, known as an RCRA cap. CRIR 12-030-021 § 2.1.09. As defined under the Solid Waste Regulations, a RCRA cap consists of four layers: a base layer, an impermeable layer of clay or geomembrane, a drainage layer and a vegetative support layer. Id. The remedy approved by DEM pursuant to the Remediation Regulations does not include an impermeable barrier across the entire site. Rather, the remedial action work plan only provided for the installation of a geotextilemembrane in those portions of the Site not covered by pavement.
DEM insists that the Solid Waste Regulations were not applicable and that the Department's decision to manage the investigation and remediation of the Site under the Remediation Regulations was appropriate, well within DEM's discretion, and entitled to deference. DEM points out that each of the Department's five witnesses to testify at trial, agreed that the Remediation Regulations were the appropriate regulatory vehicle for managing the investigation and remediation of a site that had not actively accepted waste for disposal for nearly twenty-five years; was abandoned well before solid waste management facilities were required to be licensed in 1992, and before the current Solid Waste Regulations came into existence in 1997; and was never licensed, nor ever eligible to be licensed, as a dump. DEM asserts that clean-ups of abandoned facilities and illegal dump sites are generally handled under the Remediation Regulations and that no evidence was presented to show that the Solid Waste Regulations are ever applied to such sites. DEM further contends that the two regulatory schemes — Remediation Regulations and Solid Waste Regulations — are mutually exclusive. The IPRARA applies to the remediation of sites contaminated with hazardous materials, and not to landfills closed under the Solid Waste Regulations. Finally, DEM asserts that its policy regarding the application of regulations is entitled to judicial deference.
Analysis
At issue is DEM's interpretation and application of its own regulations pursuant to its statutory authority and "[a]n agency's interpretation of its own regulation is due great deference." Massachusetts v. Hayes,691 F.2d at 62 (citing Udall v. Tallman, 380 U.S. 1, 16, (1964)); see also Cluley, 808 A.2d at 1103-04 (court held that it was error to substitute for a definition used by a governmental agency in the application of its own regulation because agency was due deference and agency's interpretation was not plainly wrong). DEM's interpretation that the Site was not a new or existing landfill subject to the Solid Waste Regulations, but a contaminated site subject to the Remediation Regulations, is therefore due such deference unless it is "clearly erroneous or unauthorized." Labor ReadyNortheast, Inc., 849 A.2d at 344. Plaintiffs' argument, however, suggests that § 1.3.123 of the Solid Waste Regulations is clear and unambiguous and, if read literally, it mandates application of the Solid Waste Regulations to the Site because it contained the requisite three yards of waste disposal.
It is a court's "responsibility in interpreting a legislative enactment to determine and effectuate what the Legislature intended and to give a meaning most consistent with its policies or obvious purposes."Gryguc v. Bendick, 510 A.2d 937, 939 (1986) (internal citations omitted). In addition, although not controlling, the interpretation given a statute by an administrative agency will be given great weight." Id.
The primary purpose of the Solid Waste Regulations is to "minimize the environmental hazards associated with the operation of solid waste landfills." CRIR 12-030-021 § 1.1.01. This purpose comports with the General Assembly's intent in establishing the refuse disposal laws requiring each city and town "to make provision for the safe and sanitary disposal of all refuse." G.L. 1956 § 23-18.9-1. According to DEM, these regulations, promulgated in 1999, apply to new and existing facilities, not to abandoned landfills. See § 1.8.00. In general, the Solid Waste Regulations are prospective, and not retrospective, in scope. They prohibit the establishment of new solid waste management or composting facilities without DEM's approval, establish an application process for the creation of such facilities, and require a license or registration from DEM to operate such facilities. CRIR 12-030-021 (2005). Additionally, the regulations provide for pre-planned closure of such facilities in accordance with environmental standards established by the agency. Id.
Therefore, a review of the whole solid waste regulatory scheme and the authorizing statutes supports DEM's decision to omit an abandoned landfill, such as existed at the Site, from the forward looking regulatory process. In fact, the evidence shows that DEM had record that the Site contained waste disposal for some time but never applied the Solid Waste Regulations. Accordingly, this Court finds DEM's interpretation is not clearly erroneous or unauthorized and the Solid Waste Regulations were not applicable to the Site.
 COUNTS THREE AND FIVE: INTENTIONALDISCRIMINATION AND EQUAL PROTECTION
Intentional discrimination in the administration of federally funded programs is prohibited by § 601 of Title VI of the Civil Rights Act of 1964,42 U.S.C. § 2000d.[9] Individuals like the Plaintiffs have a private right to sue to enforce their Title VI rights. Alexander v. Sandoval, 532 U.S. 275, 280-81
(2001). Section 601 specifically prohibits those acts of intentional discrimination that violate the Equal Protection Clause of the Fourteenth Amendment. Id. at 279. "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." Village of Arlington Heights v. MetropolitanHousing Dev. Corp., 429 U.S. 252, 265 (1977).
A. Plaintiffs' Argument
The gravamen of Plaintiffs' Equal Protection claim is that locating the schools on the Site was an intentional act of racial discrimination. Plaintiffs assert that there was ample evidence to infer intent on behalf of all of the Defendants based on an analysis of the following factors that the United States Supreme Court has deemed relevant to such an inquiry: the impact of the decision, the historical background of the decision, the sequence of events leading up to the decision, the legislative or administrative background of the decision, and the departures from the normal process of reaching such a decision. Id. at 268 (identifying subjects of proper inquiry in determining whether racially discriminatory intent existed).
The starting point is Plaintiffs' insistence that the evidence revealed that the decision to locate the schools bears most heavily on minorities and, as such, has a disparate impact on that discrete class. Facts allegedly supporting this claim of disparate impact include: the racial make-up of the schools is 77% to 84% non-white; non-white students in Providence suffer from higher rates of malnutrition and environmental illnesses such as asthma and lead poisoning, and Providence school age children are more susceptible to injury from contamination than children in other parts of the state. Plaintiffs argue that the disparate impact is the more egregious because it was foreseeable. DEM admittedly knew that the Site was located in an "environmental equity" community with a large population of racial minorities, but expedited review of the project while ostensibly ignoring safety concerns raised by largely non-white objectors to the City's plans, despite having had no prior experience evaluating a remediation plan for a school on a dump. Similarly, the City was aware that the schools would serve a predominantly non-white population and forged ahead while overlooking public outcry and skirting precise permitting and regulatory requirements.
Plaintiffs claim that the following evidence, all part of the sequence of events leading up to the ultimate decision and all allegedly amounting to departures from the normal process by which such a site would be reviewed, reveals invidious intent on the part of DEM: DEM (a) approved the City's SIR before allowing the public to review and comment on the same which effectively eliminated any possibility for the largely non-white objectors to influence the outcome, (b) ignored its mandatory duty under the IPRARA to consider environmental equity issues for racial minorities, (c) approved an incomplete SIR and a less protective remedy than the presumptive remedy used to close a landfill, (d) approved the construction of two schools on top of an unlicensed solid waste management facility that, according to Plaintiffs, continues to operate in violation of the Solid Waste Regulations, (e) ignored its own Immediate Compliance Order halting the City's excavation and stockpiling of soil and allowed the City to implement the remedy prior to granting approval and with knowledge that the City's implementation of the remedy was causing adverse health effects in the community, and (f) failed to impose an environmental land use restriction on the Site even four years after it approved the City's plans.
Plaintiffs also claim that there is abundant evidence to establish intent on the part of the Municipal Defendants. As to the history of the decision, Plaintiffs argue that City officials were aware of a steady increase in student population caused by an influx of Latinos over a five year period, that they were also aware that the number of white students was decreasing as a percentage of that population, and that they waited until the fall of 1998 to begin planning schools that needed to be operational by the fall of 1999. Therefore, the Plaintiffs allege that the process of elimination orchestrated by Defendant Sepe was truncated by the City's self-imposed time constraint requiring construction to begin by April 1, 1999: the Almacs and Neutaconcacut Park sites were eliminated before a preliminary drawing stage of the site selection process; only a "chicken scratch site plan" was made for the Merino Park site, but no environmental tests were performed by the municipal defendants at Merino Park because Sepe learned it would take a year to get a wetlands permit and that there were environmental issues relating to the Woonasquatucket River which abutted that site.
Additionally, the Plaintiffs claim the specific sequence of events leading up to the decision to place the schools on the Site further evidences the Municipal Defendants' discriminatory intent. Primarily, Plaintiffs point out the failure on the part of the City to invite the requisite public comment and the allegedly blatant disregard of the public outcry against the proposed schools. Plaintiffs particularly point to the following sequence of events that occurred between February and June of 1999 as indicative of the Municipal Defendants' ill motives. Despite almost immediate opposition from neighbors, the final site of the schools was determined in February of 1999 at which time the City first announced its plan to build the schools. DEM (receiving approximately two or three calls a day from concerned neighbors) quickly contacted the Mayor's office to apprise the City of records indicating that there was a landfill at the Site, but the City's initial response was to deny that fact. Meanwhile, various city officials (Plaintiffs point out that they were white city officials) took action to put construction of the schools on the fast track in order to commence work at the Site by April. On March 1, 1999, then Mayor Cianci requested that the City Council issue bonds to build the schools; on or about March 6, 1999, the City sent bulldozers to the Site to clear trees and vegetation without notifying and warning abutting residents, on March 15, 1999, the construction management contract for the schools was awarded. By April 8, 1999, without holding a public hearing, the City Council approved the issuance of bonds for the schools. In response to newspaper articles and calls from concerned neighbors on the issue, DEM met with representatives of the City on March 1, 1999 to discuss the City's plans for building the schools on the Site. Not until that March 1st meeting did the City acknowledge that the Site was a former landfill.
The City remitted a SIR on March 26, 1999 and a RAWP on April 2, 1999 without any detailed drawings of the proposed construction or remedial systems. Thereafter, white city officials, Sepe and Mr. Troiano, asked DEM to expedite review of the SIR and the RAWP, stressing the necessity of a September 1st opening, and DEM agreed to the requests. Within two weeks time, DEM issued a Remedial Decision Letter on April 9, 1999.
Concurrently, during the months of March and April of 1999, community opposition to placing the schools on the Site grew. Opposition was expressed at a community forum on March 16, 1999 at the Silver Lake Community Center and at meetings of the PSB. On April 19, 1999, DEM and the City met privately to plan a second public forum and the attendants, virtually all of whom were white according to the Plaintiffs, focused on how to assuage rather than address the public's fears. The Plaintiffs contend the outcome of the second public meeting, held April 26, 1999, was preordained, and the opposition expressed by the 12 out of 15 attendees was largely ignored.[10] In fact, by April 26th, the City had already incurred expenses in an amount between $300,000 and $400,000. The Plaintiffs claim that while the opposition of non-whites resulted in School Board votes that were cast along racial lines (on April 26, 1999 the PSB voted 4-3 to reject the issuance of bonds and on May 4, 1999 they voted 5-3 to reject issuance of the bonds), the ultimate school board approval was coerced by the continued construction. By the time of the May 10, 1999 approval by a vote of 7-1, part of the foundation for the elementary school building had already been poured and piles were driven to support the middle school building. Plaintiffs quote a member of the School Board: "It is outrageous that this school board is being forced to approve a site and this construction under the pressure of the bulldozers and pile drivers. Never again should this school board have to approve a site for a school after construction has already been started."
As further evidence of invidious discriminatory intent on the part of the Municipal Defendants, Plaintiffs point out the obvious irregularities attendant to the process of siting these schools. The Municipal Defendants disregarded both DEM requirements — commencing construction prior to DEM approvals and ignoring DEM stop work orders — and the City's own building ordinance. The Building Ordinance of the City of Providence, Section 112.1, Chapter 1079 of the Ordinances of 1956, enacted December 21, 1956, as amended, makes it unlawful to construct a building without obtaining the required building permit, yet, as of May 7, 1999, the City had not received the required foundation permit for either the elementary or middle school, and by then the foundation for the elementary school building had already been partially built. Defendant Sepe authorized both the pouring of foundations and the driving of piles, despite acknowledging at trial that DPP had no written policy of starting construction without building permits. Ultimately, the building permit for the elementary school was not obtained until August 31, 1999, but the school was completed and opened to students in early September. Likewise, the middle school permit was not issued until October 14, 1999.
Lastly, Plaintiffs assert that the purported justification for fast tracking the schools at the Site was pre-textual: they claim that an elementary school could have been expeditiously and efficiently constructed on the Gordon Avenue site in time for a September opening and they point out that the middle schools did not open in September. Accordingly, the Plaintiffs argue that the Municipal Defendants' decisions were motivated by the race and/or color of both the students designated to attend the schools and the opponents of the plan to construct the schools on the former landfill, in violation of § 601 of Title VI of the Civil Rights Act, along with the Fourteenth
Amendment to the United States Constitution and Article 1, Section 2 of the Rhode Island State Constitution.[11]
B. DEM's Arguments
DEM denies that the race of either city officials, community members, or students attending the school, played any roll in DEM's site approval process. DEM's main contention, however, is that Plaintiffs have failed to establish the threshold element for a claim of intentional discrimination pursuant to the ArlingtonHeights factors: discriminatory impact. DEM contends that the Plaintiffs' have not demonstrated any actual or substantial likelihood of negative environmental harm. DEM cites Lucero v. Detroit Public Schools,160 F.Supp. 2d 767 (E.D. Mich. 2001), as illustrative of Plaintiffs' failure to establish harm or disparate impact. In Lucero, the court concluded that plaintiffs' constitutional rights had not been violated despite evidence that the Site in question: (a) had a long history of industrial uses involving volatile and semi-volatile organic compounds, petroleum products, polychlorinated biphenyls ("PCBs"), chlorinated solvents, heavy metals/and radioactive paints, id. at 5, (b) exhibited more substantial contamination than was found at the Site,[12] (c) was subjected to a much more limited remedy than was required at the Site,[13]
and (d) had a history of unexplained medical problems (severe bloody noses, respiratory difficulties, fatigue, diarrhea, liver pain and rashes) experienced by construction workers who worked on the school. Id. at 12. Despite the available evidence, DEM points out that the Lucero court was unable to conclude that the apparent risk of harm associated with the construction of a school on a contaminated site was "likely to result in the violation of Plaintiffs' constitutional right to personal security and bodily integrity." Id. at 22-23 (emphasis in original). Rather, the court found that while the Plaintiffs' filings were "replete with allegation of speculative dangers . . . [s]uch speculation . . . is not evidence upon which the Court can conclude . . . that Defendants disregarded an obvious risk of harm that is likely to result in the violation of Plaintiffs' constitutional rights." Id. at 23.
DEM asserts that, despite having had four years to study the Site and the health of the students and staff attending those schools, Plaintiffs have failed to produce even the same quantum of evidence that was produced in the preliminary phases of Lucero. Moreover, DEM argues that Plaintiffs presented no evidence to support their contentions that the site investigation failed to adequately assess the contaminants at the Site or that the remedy fails to provide adequate protection from exposure to contaminants at the Site. DEM maintains that the mere fact that contaminants may be present at the Site does not mean that the remedy (waste removal, soil cap, sub-slab venting and monitoring program) is not effectively preventing exposure to these contaminants. DEM emphasizes that if exposure to contaminants is being effectively prevented by the remedy then there is no adverse impact.
DEM contends that the Plaintiffs' objections and the objections voiced by other community members in the April 26, 1999 public hearing are objections only to the "idea" of building schools on remediated properties like the Springfield Street Schools Site. DEM maintains that neither the Plaintiffs nor the community members who commented at the public hearings were able to support their fears with evidence that the remediated Site presents an unreasonable risk of harm. Rather, DEM contends that these objections to the concept of building schools on remediated sites are policy objections that run to the political question of whether the City should even consider such sites for the construction of schools. DEM argues that its role in this matter involves the limited, technical question of whether a specific site can be safely remediated to support its use for a school, rather than the larger question of whether schools should be sited on properties that require remediation. At this time, DEM maintains there is no technical evidence that the approved remedy is inadequate to protect the students and staff at the Springfield Street Schools.
C. Municipal Defendants' Arguments
Initially, the Municipal Defendants assert that the Superior Court Order denying Plaintiffs' request for a TRO prior to the opening of the schools, obtained after a five day hearing in which Plaintiffs' expert Dr. Mitchell testified, conclusively established the Constitutional validity of the decision to site the schools on Springfield Street. They further assert that in the four years since the denial of that TRO, Plaintiffs have failed to establish that any person has been harmed by the school. Additionally, the Municpal Defendants point to the evidence in terms of theArlington Heights factors and conclude that there is no indicia of discriminatory intent.
Aside from the lack of evidence establishing harm to anyone in the school community, the Municipal Defendants also contend that the impact, if there were any, does not bear more heavily on any one race (i.e. Black, Hispanic, Asian). Additionally, since all but one elementary school had a majority of non-white students, any choice of neighborhood in which to build the schools would have affected non-whites more than whites.
The Municpal Defendants rely on the testimony of Dr. DeRobbio (at the time, the Director for school support and business operations within the Providence School Department) to show the non-discriminatory historical background of the decision. Dr. DeRobbio testified that children are assigned to schools based upon their geographical locations and that the School Department did not know what the particular racial breakdown of Springfield Street schools would be. DeRobbio explained that there was a need for an elementary school in the northwest section of the City because of overcrowding in the existing schools and population growth. According to DeRobbio, the Site was chosen because it had enough land for the three schools being proposed, as well as enough acreage for the necessary playground and parking area. The School Department was providing bus transportation for students living in that neighborhood to several other elementary and middle schools, at an annual cost of approximately $45,000 per bus. After the schools were opened, only one bus was needed for both the elementary and middle school students. DeRobbio also testified that if the schools were closed, the students would go to "wherever there is a vacant seat" in another elementary or middle school, although "currently, there are no vacant seats available" at the elementary level; and "probably less than 100" for the middle schools. He further explained that the school board was required to maintain a 26 to 1 student/teacher class size ratio, as imposed by a contract with the teachers as well as a Superior Court Order, and that closure of the schools "would place the school department in violation" of the Court Order. DeRobbio did not know where the school department would send the 400 elementary school students if the court ordered the schools closed. The possible options included leasing trailers for temporary classrooms and refurbishing other buildings, each of which involved costs to the School Department.
The Municipal Defendants also cite to the testimony of Sepe and argue that his process of elimination was motivated only by a desire to procure a site that could accommodate the much needed new buildings within the proscribed time constraints. His rejection of the Neutaconkanut site for deed restrictions, the Plainfield Street site at the suggestion of architectural experts, and the Merino Park site for wetland restrictions, were well researched decisions based on practical concerns.
The Municipal Defendants further maintain that there were no substantive or procedural deviations in the site selection process. The school department identified a need and contacted Sepe in the DPP. Sepe contacted the Planning Department and received a list of available sites from which he chose one to recommend. The school department agreed with his recommendation and a Phase I Environmental Assessment was conducted. Subsequently a Phase II Environmental Assessment was conducted. All this is standard procedure in the site selection process. The Municpal Defendants also contend that the delay in procuring building permits was acceptable according to Sepe's understanding with the building inspector and a practice of obtaining verbal approvals.
Additionally, the Municpal Defendants argue that the decision to construct the schools was made in accordance with the normal legislative process. The PSB voted in favor of the City Council issuing bonds, the Mayor issued a request to the City Council, and the City Council approved. The Muncipal Defendants point out that the City Council resolution to issue bonds included a number of schools and not just those on the Site. The Municipal Defendants assert that no public hearing was required relative to the issuance of the bonds.
Basically, the Municpal Defendants claim that the only classification used in making the decision was geographic (to the extent students were targeted by the decision they were only targeted based on their residential address), and they argue that such a classification neither burdens a suspect class nor impinges on a fundamental right. Therefore, they assert that the classification will withstand an equal protection challenge if it is rationally related to a legitimate state purpose, Hoffman v. City of Warwick,909 F. 2d 608, 622 (1st Cir. 1990), and relieving schools of overcrowding, complying with a teacher/student ratio court order, and providing neighborhood schools, are all legitimate state purposes.
D. Analysis
Section 601 of the Civil Rights Act of 1964,42 U.S.C. § 2000d, provides as follows:
 "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."
The Supreme Court has held that this statute "proscribes only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment," Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 287
(1978); accord Sandoval, 532 U.S at 279, and that proof that a racially discriminatory purpose has been a motivating factor in the decision is required to show such a violation. Arlington Heights, 429 U.S. at 265-66. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Id. at 267. In ArlingtonHeights, the Court reviewed a variety of factors that could potentially "shed some light on the decision-maker's purposes." Id. at 267. Accordingly, the Arlington Heights factors are relevant to the instant case and this Court reviews those factors in determining whether or not the decision to site the schools on Springfield Street was motivated by an intent to discriminate on the basis of race.
Discriminatory impact is often the starting point of the inquiry when the state action is racially neutral on its face. Id. at 266; Washingtonv. Davis, 426 U.S. 229, 242 (1976); Yick Wo v. Hopkins, 118 U.S. 356
(1886). In the instant case, the act of siting the schools on Springfield Street has naturally impacted the community served by the schools, members of which are predominantly non-white.[14] This would be true of a school built on any site in any neighborhood to the extent that a new educational facility impacts its surrounding community. Whether or not this impact can be deemed discriminatory is less clear. Plaintiffs' argument suggests that the remedy implemented is insufficient to protect students and the community from the danger of contaminants present at the Site and therefore they are exposed to great risk of harm. However, since the Solid Waste Regulations were inapplicable, the residential criteria of the Remediation Regulations were adequately met, and there is, as yet, no evidence of actual harm to persons, it is unclear whether there is any actual harm or any real risk of harm. See Lucero,60 F. Supp. 2d at 795 ("Plaintiffs in the case at bar have been unable to provide this Court with concrete evidence of harm to the students."). To the extent the remedy imposed at the Site is doing its service and will continue to do its service as was supported by the credible evidence in this case, there is no contamination affecting students or the surrounding community, and the impact is not discriminatory: these students are being treated the same as students at any other school who are not exposed to contaminants. Accordingly, without proof of disparate impact, Plaintiffs' equal protection claim stalls at step one. Still, discriminatory impact "is not the sole touchstone of an invidious racial discrimination." Arlington Heights, 429 U.S. at 265. The ArlingtonHeights Court stated that with these factors it was "identify[y], without purporting to be exhaustive, subjects of proper inquiry in determining whether racially discriminatory intent existed." Id. at 268. Presumably, even if no harm is proved, an intent to cause such harm, might still be apparent and amount to a violation of Plaintiffs' right to equal protection.
Yet, "[w]here the decision maker is motivated by a factor other than the party's race, there can be no intentional discrimination." Buchananv. City of Bolivar, 99 F. 3d 1352, 1356 (6th Cir. 1996). While Plaintiffs' evidence proves that the process was rushed and even sloppily executed, there is insufficient evidence to support a finding that intent to discriminate was the driving force behind Defendants' actions. To the contrary, credible evidence was presented to show that the Defendants' motivation to build the schools on the Site was clearly based upon factors other than race. The Municipal Defendants' were focused on alleviating overcrowded classes, saving money on student transportation costs, and complying with a court order. Providing students with one neighborhood school was a step toward resolving each of these issues. The decision to locate the buildings within the neighborhood being served was also motivated by a cost analysis. The Site was the best choice among those available at the time the need for new schools became unavoidable. Even if the Plaintiffs could prove that the opportunity for community involvement in the decision making process was purposefully limited so as to expedite construction, there would not be a showing of discriminatory intent because the City Defendants were motivated by clearly legitimate purposes. Additionally, DEM, who had no hand in choosing the Site, provided that level of oversight necessary to assure that the proper remedy was put in place in accordance with legally established criteria. Even if there had been more opportunity for community involvement, unless evidence, which has not yet been produced, showed that the remedy was inadequate to the task, DEM would have been compelled to approve the RAWP. Thus, the Plaintiffs claims under Counts Three and Five must fail.
 COUNT FOUR: DUE PROCESS
Plaintiffs claim that they were deprived of both "property" and "liberty" interests that are protected by the Due Process Clauses of the United States and the Rhode Island Constitutions. Specifically, they assert that they have a fundamental liberty right to control the formal education of their children and that their children have a fundamental right to bodily security, both of which are protected by the substantive component of the Due Process Clause. Additionally, they claim that they were deprived of a property right, created by the IPRARA, to community involvement and adequate notice, which is protected by the procedural component of the Due Process Clause. Plaintiffs allege that the IPRARA and the Remediation Regulations established the procedural process that was due and that Defendants' failure to adhere to the statute and the attendant regulations resulted in a clear denial of that process. Additionally, Plaintiffs claim that Defendants' decision to site the school on a former dump, accompanied by the failure to adhere to the legally established procedural process and the adoption of a remedy that Plaintiffs believe to be inadequate to the task,[15] exhibited a deliberate indifference to the Plaintiffs' rights which also transgressed their right to substantive due process.
Defendants counter that the IPRARA created no constitutionally protected property right and that Plaintiffs' were not deprived of either their right to control their children's education nor their children's right to bodily integrity. Additionally, Defendants assert that the notifications that were given were adequate to afford Plaintiffs' procedural due process if any property or liberty right had been at risk. Defendants further assert that there was no substantive due process violation because the siting of the schools on Springfield Street was the result of a well reasoned selection process and that the remedy implemented was protective of the students and the community.
The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property without due process of law." The United States Supreme Court has found that the Due Process Clause affords individuals "three different kinds of constitutional protection." Daniels v. Williams, 474 U.S.327, 337, (1986) (Blackmun, J., concurring). "First, it incorporates specific protections defined by the Bill of Rights." Id. "Second, it contains a substantive component, sometimes referred to as `substantive due process,' which bars certain arbitrary government actions `regardless of the fairness of the procedures used to implement them.' Id. Finally, "it is a guarantee of fair procedure, sometimes referred to as `procedural due process.' Id.
Plaintiffs assert claims alleging violations of both substantive and procedural due process.
Substantive Due Process.
"Substantive due process serves `as a check on official misconduct which infringes on a `fundamental right' or as a limitation on official misconduct, which although not infringing on a fundamental right is so literally `conscience shocking,' hence oppressive, as to rise to the level of a substantive due process violation." Lucero,160 F.Supp. at 799. Fundamental rights worthy of substantive due process protection are those "rights and liberties which are, objectively, `deeply rooted in this Nation's history and tradition,'"Washington v. Glucksberg, 521 U.S. 702, 721 (1997) (quoting Moore v. EastCleveland, 431 U.S. 494, 503 (1977)), "and `implicit in the concept of ordered liberty,' such that `neither liberty nor justice would exist if they were sacrificed.'" Id. (quoting Palko v. Connecticut, 302 U.S. 319, 325,326 (1937). Substantive due process "protects certain `fundamental liberty interests' from deprivation by the government, regardless of the procedures provided, unless the infringement is narrowly tailored to serve a compelling state interest." Chavez v. Martinez, 538 U.S. 760, 775
(2003) (quoting Glucksberg, 521 U.S. at 721). In instances where a fundamental right is not at stake, a substantive due process violation may be established by showing that legislation was "`clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.'" Kaveny v. Town of Cumberland ZoningBd. Of Review, 875 A.2d 1, 10 (R.I. 2005) (R.I. 2005) (quoting Brunellev. Town of Kingstown, 700 A.2d 1075, 1084 (R.I. 1997)). The United States Supreme Court has also held that non-legislative government conduct that results from "deliberate indifference" and is so egregious that it "shock[s] the conscience" may also give rise to a substantive due process violation. Chavez, 538 U.S. at 774.
Essentially, Plaintiffs advance three substantive due process arguments, none of which is availing under the facts of this case. First, they cite to Lucero, and allege that their children's fundamental right to bodily security has been put at risk by the potential exposure to contaminants at the Site. The Lucero facts are strikingly similar to the facts of this case: Lucero involved the construction of a school on a former industrial site in Detroit. Lucero, 160 F. Supp. at 771. In contrast, however, the Lucero building site had a documented history of heavy industrial use and was located in an industrially zoned section of the city, plus the evidence showed that construction workers became physically ill while working on the site. Id. at 772, 776. Still, while the Lucero court did find that students had a fundamental right to personal security and bodily integrity, there was no substantive due process violation where the alleged harm to that bodily security was merely speculative. Id. at 799 ("While a student has a Fourteenth
Amendment right to personal security and bodily integrity, there must be a showing that the `force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than merely careless or unwise zeal that it amounted to a brutal and inhuman abuse of power literally shocking to the conscience.'") (quoting Lillard v. Shelby Cty Bd. of Education,76 F.3d 716, 725 (6th Cir. 1996)). In the instant case Plaintiffs have produced no evidence that any student at the school has been harmed by any contaminants existing at the Site. Additionally, this Court has held, supra, that the remedy applied to the Site satisfied the requirements of the Remediation Regulations and is therefore presumptively protective of human health and the environment; there was also credible expert testimony to the effect that the contaminants present at the Site would not threaten students or the surrounding community. In other words, the students' bodily security has in no way been infringed and no fundamental right has been compromised.
Second, Plaintiffs claim that Defendants violated their fundamental liberty interest to control the formal education of their children. While this liberty has clearly been recognized by the United States Supreme Court as among those rights deemed fundamental, see Glucksberg,521 U.S. at 720 (citing Meyers v. State of Nebraska, 262 U.S. 390, 399
(1923) (holding that Due Process protected parents right to engage foreign language teacher to educate their children)), it is not absolute. Indeed, "[t]he power of the State to compel attendance at some school and to make reasonable regulations for all schools, . . . is not questioned," Meyers, 262 U.S. at 402, neither is the power to "to prescribe a curriculum for institutions which it supports." Id. These state powers, clearly curtail a parent's ability to control their child's education to some extent — a parent may not choose to forgo educating their child completely nor may they disregard school rules — but they do not violate the fundamental right to "direct the education and upbringing of one's children," Glucksberg, 521 U.S at 720 — a parent may choose home-schooling or between public and private schools. Likewise, siting the schools on Springfield Street did not infringe upon this liberty. Unlike the situation in Lucero, the City did not force students to attend the Springfield Street schools. For example, Deborah Martin received notice during the 1998-99 school year that her son was being assigned to a Springfield Street school but, upon her request, the school department allowed him to stay in the school he was already attending. Additionally, since the remedy implemented is presumptively protecting human health and the environment from any contaminants, and the choice of siting the schools on Springfield Street was reasonably related to the legitimate state purpose of providing adequate public school space for a growing population, the fact that the parents may have limited their own choice based on fear of the Site cannot be attributed to the Defendants.
Additionally, Plaintiffs claim that Defendants' actions with respect to siting and approving the schools constituted an abuse of power and an exhibition of deliberate indifference to the rights of the children. Yet, even aside from the fact that the remedy approved has satisfied the Remediation Regulations and is protecting students and others from any potential contamination, the decision to site the school, and the attendant process, although truncated and in violation of certain statutory provisions, does not "shock the conscience." The city was in dire need of a new school in the Springfield Street neighborhood in order to avoid overcrowding; Sepe reviewed at least four potential sites before making a recommendation;[16] and while the community involvement process may have been flawed, the remedy applied to the Site was the strictest required under the existing regulations. Indeed, even in light of Plaintiffs' evidence produced at trial showing the sensitivity of inner city children to contaminants and the threat posed by the contaminants present, but contained, at the Site, the remedy chosen would still have been the strictest required by law. Therefore, Defendants' actions in siting the schools do not manifest a deliberate indifference to the Plaintiffs' rights, nor do they shock the conscience so as to give rise to a substantive due process violation.
Procedural Due Process.
"The most familiar office of [the Due Process Clause] is to provide a guarantee of fair procedure in connection with any deprivation of life, liberty or property by a State." Collins v. City of Harker Heights,503 U.S. 115, 125 (1992). Before determining whether the procedure was fair, a plaintiff must first establish that he has a constitutionally protected private interest; and that there was a deprivation of that interest caused by government action. Mathews v. Eldridge, 424 U.S. 319,335 (1976). Plaintiffs ground their procedural due process claim on alleged property interests in the community involvement procedures mandated by the IPRARA and the Remediation Regulations. These interests were taken, as a matter of law, since this Court has held, supra, that the statute was violated. Therefore, the threshold issue is whether or not the statute granted Plaintiffs any constitutionally protected property rights in these procedures.
Property interests are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." Bd. of Regents of State Colleges v. Roth, 408 U.S. 564,577 (1972). "To have a property interest in a benefit, a person must have. . . . a legitimate claim of entitlement to it." Id. A claim of entitlement based on a procedural statutory or regulatory scheme may be found where there was a "repeated use of explicitly mandatory language in connection with requiring specific substantive predicates." Hewitt v.Helms, 459 U.S. 460, 473 (1983) (concluding that State had created a protected liberty interest in prison administration rule); see alsoDavila-Lopes v. Zapata, 111 F.3d 192, 196 (1st Cir. 1997) (holding that no property interest was created by hospital rule which didn't sufficiently circumscribe hospital administrators' discretion). However, "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." Town of Castle Rock, Colorado v.Gonzales, 125 S. Ct 2796, 2803 (2005) (holding that despite the mandatory language in a restraining order and an enforcing statute, the State had not conferred a benefit on the plaintiff because "a well established tradition of police discretion has long coexisted with apparently mandatory arrest statutes." (at 2805-06)).
Plaintiffs claim that the IPRARA as well as the Remediation Regulations are independent state law sources conferring a property right on "abutters" and "interested parties" such that they have a legitimate claim of entitlement to partake in the process.[17] Both the statute and the regulations use "language of an unmistakably mandatory character." Hewitt, 459 U.S. at 471; see supra, note 19. Additionally, both mandate certain action upon occurrence of specific substantive predicates; for example notification is required prior to implementation of Site Investigation activities, and again when the investigation is deemed complete. Hewitt, 459 U.S. at 472; cf. Olim v. Wakinekona,461 U.S. 238, 249 (1983). The controlling question is whether or not DEM's or the City's discretion to abide by the laws was curtailed. This determination depends on whether or not the provisions were truly mandatory. City of Castle Rock, 125 S.Ct. at 2805.
Rhode Island "recognize[s] the general distinction between statutes aimed at public officers and those aimed at individuals," Town ofTiverton v. Fraternal Order of Police, 118 R.I. 160, 164 (1977); which allows for substantial compliance by the former but strict compliance by the latter. Washington Highway Dev. v. Bendick, 576 A.2d 115, 116 (R.I. 1990); Gryguc v. Bendick, 510 A.2d 937, 941 (R.I. 1986). In WashingtonHighway Development, 510 A.2d at 117, the Court held that where the notice provision was directed at public officers and not followed by a sanction for non-compliance, the provision was directory rather than mandatory. Conversely, in Town of Tiverton, 118 R.I. at 165, where the notice provision was directed at private persons and conditioned rights on compliance thereto, the Court held that the provision was mandatory.
The overall statutory scheme of the IPRARA is to foster redevelopment and reuse of contaminated properties in order to protect "human health and the environment based on current and reasonably foreseeable future use." Section 23-19.4-4. Environmental equity is a concept that acknowledges the disadvantaged status of many of the communities in which contaminated sites are located. The Environmental Equity and public participation provision promotes the involvement of the low income and minority populations likely to be surrounding each site in the remediation process. Section 23-19.4-5. The provision seeks to advance the power of such individuals to participate in a process that affects their daily lives. See Tanner v. Town Council of the Town of EastGreenwich, 2005 R.I. LEXIS 154 (July 18, 2005) (explaining that knowledge is power in the democratic process). However, the provision is directed at DEM and the General Assembly did not include any sanctions for non-compliance. Therefore, the environmental equity provision is not truly mandatory such that it gives rise to a property right upon which Plaintiffs may rely. On the other hand, the Remediation Regulations are largely directed at private actors — performing and responsible parties. The stated purpose of the Remediation Regulations is "to create an integrated program requiring reporting, investigation and remediation of contaminated sites" Section 1.02. Integrated within that program are the notice provisions requiring performing parties to act and conditioning rights upon those required actions: "prior to the formal department approval . . ., the performing party must" and "prior to implementation . . ., the performing party must." Therefore the requirements of the Remediation Regulations were mandatory as far as they imposed obligations on the City, as a performing party, to act, and Plaintiffs' claim of a property right based thereon may be protected by the Due Process Clause.
Once a constitutionally protected right has been established, the next question must be whether the process provided prior to the deprivation was adequate. Zinermon v. Burch, 494 U.S. 113, 126 (1990) ("[I]t is necessary to ask what process the State provided and whether it was constitutionally adequate). "The fundamental requirement of due process is the opportunity to be heard `at a meaningful time and in a meaningful manner.'" Mathews v. Eldgridge, 424 U.S. 319, 333 (1976). In the instant case, no process was provided prior to depriving the Plaintiffs of their right to notice. The deprivation was final at the time it occurred. Clearly, no process cannot equal due process. Therefore, it is not necessary to determine what process would be required prior to a deprivation of the right to proper notice in order to determine that the City violated Plaintiffs' due process right.
The final question remaining under § 1983, is whether or not Plaintiffs were damaged. The denial of due process is actionable only for nominal damages without proof of actual injury, and substantial damages should be awarded only for actual injury. Carey v. Piphus, 435 U.S. 247, 266
(1978). In the instant case, Plaintiffs have not proved damages. Plaintiffs allege that had their right to proper notice and community involvement not been deprived, the schools would not have been built on Springfield Street and they would not be threatened by the potential escape of contaminants. However, given the evidence before this Court, particularly the lack of evidence as to injury and the ample evidence as to the adequacy of the remedy according to the applicable laws, it is unlikely that DEM would not have given its approval to the City in any event. Accordingly, the failure of the city to provide proper notice did not harm the Plaintiffs and is only subject to nominal damages.
 CONCLUSIONS OF LAW
1. The Municipal Defendants violated the notice provisions of the Remediation Regulations, § 7.07, by failing to notify landowners and tenants abutting the Site, prior to the commencement of investigatory activities that they were about to commence such investigatory activities.
2. DEM violated the public participation requirements of the IPRARA and § 7.07 of the Remediation Regulations by failing to notify landowners and tenants abutting the Site, and/or by failing to assure that the municipal defendants notified landowners and tenants abutting the Site, prior to the commencement of investigatory activities on the Site, that the Municipal Defendants were about to commence such investigatory activities.
3. The Municipal Defendants violated the notice provisions of the Remediation Regulations, § 7.07, by failing to notify landowners and tenants abutting the Site, prior to the submission of the SIR to DEM, that the SIR was complete, and failing to provide such abutters with the findings of the investigation and any proposed remedial alternative which included on site treatment and/or containment of hazardous materials as part of the final remedy.
4. DEM violated the public participation requirements of the IPRARA and § 7.07 of the Remediation Regulations by failing to notify landowners and tenants abutting the Site, and/or by failing to assure that the Municipal Defendants notified landowners and tenants abutting the Site, prior to the Municipal Defendants' submission of the SIR to DEM, that the SIR was complete, and failing to provide said abutters with the findings of the investigation and any proposed remedial alternative which included on site treatment and/or containment of hazardous materials as part of the final remedy.
5. The Municipal Defendants violated § 10.01 of the Remediation Regulations by conducting excavation, soil sifting, bulldozing, and construction activities on the Site prior to submitting, and receiving DEM approval of, a RAWP.
6. DEM violated § 7.09 of the Remediation Regulations by issuing a Remedial Decision Letter that determined the Municipal Defendants' SIR was complete, prior to making the SIR available to the public for public review and comment regarding the technical feasibility of the preferred remedial alternative proposed therein involving on-site treatment and/or containment of hazardous materials.
7. DEM violated the IPRARA, § 23-19.14-5, by failing to take a "hard look" at issues involving the environmental equity of constructing the schools on the Site, and failing to consider environmental equity as a factor in making its ultimate determinations to approve the SIR and RAWP, and issue its Order of Approval.
8. DEM violated the IPRARA, § 23-19.14-5, by failing to develop and implementing a process that ensured community involvement throughout the investigation and remediation of the contaminated sites where the schools were built.
9. Defendant Sepe's determinations to site the schools, and to commence construction activities in the absence of City ownership of the Site, and in the absence of necessary DEM and City Building Department approvals, were policy determinations of the City within the meaning of 42 U.S.C. § 1983.
10. DEM, acting under color of state law, did not intentionally discriminate against the Plaintiffs on the basis of race and/or color and/or national origin.
11. The Municipal Defendants, acting under color of state law, did not intentionally discriminate against the Plaintiffs on the basis of race and/or color and/or national origin.
12. The Municipal Defendants, acting under color of state law, deprived the Plaintiffs of property in the absence of procedural due process of law, in violation of the 14th Amendment to the U.S. Constitution, and Article I, Section 2 of the R.I. Constitution by failing to provide the proper notice and community involvement procedures mandated by the Remediation Regulations.
13. DEM did not deprive the Plaintiffs of property in the absence of procedural due process of law, in violation of Article I, Section 2 of the R.I. Constitution by failing to provide the proper notice and community involvement procedures mandated by the IPRARA.
14. The Municipal Defendants, acting under color of state law, did not deprive the Plaintiffs of liberty or property in the absence of substantive due process of law, in violation of the 14th Amendment to the U.S. Constitution, and Article I, Section 2 of the R.I. Constitution.
15. DEM did not deprive the Plaintiffs of liberty and property in the absence of substantive due process of law, in violation of Article I, Section 2 of the R.I. Constitution.
 REMEDY
Given the specific claims brought by Plaintiffs against Defendants, the findings of fact and the conclusions of law infra, this Court will not impose a remedy until a further hearing is held. The parties are directed, within thirty days of the filing of this decision, to confer with each other to either (1) submit a proposed remedy, or (2) submit suggested dates for hearing on a remedy.
[1] Plaintiffs, citing Corrente v. State of Rhode Island,759 F.Supp. 73, 80 (D.R.I. 1991), profer an additional argument suggesting that the federal claims are exempt from the procedural rules by virtue of Rule 17 (b) of the Federal Rules of Civil Procedure. However, it is axiomatic that federal procedural rules do not apply in a state court. See Johnson v. Fankell, 520 U.S. 911, 920, (1997) (holding that a federal procedural right does not apply in a nonfederal forum).
[2] "The word standing is rather recent in the basic judicial vocabulary and does not appear to have been commonly used until the middle of our own century. No authority that I have found introduces the term with proper explanations and apologies and announces that henceforthstanding should be used to describe who may be heard by a judge. Nor was there any sudden adoption by tacit consent. The word appears here and there, spreading very gradually with no discernible pattern. Judges and lawyers found themselves using the term and did not ask why they did so or where it came from." Black's Law Dictionary 1413 (7th ed. 1999) (quoting Joseph Vining, Legal Identity 55 (1978)).
[3] Both DEM's original answer and amended answer listed lack of standing of HPTA as an affirmative defense, while the Municipal Defendants failed to mention standing at all.
[4] No evidence was presented that any child attending the schools had in fact been injured as a direct and proximate result of exposure to any substances at the schools.
[5] While IPRARA does not define the term, the parties are in agreement as to its technical meaning. DEM asserts that issues of "environmental equity" do not solely effect low income and racial minorities, and that the agency considers such issues as a matter of course when considering such factors as the effects the clean-up would have on surrounding populations.
[6] With regard to soil testing, DEM also maintains the soil on the Site was widely tested for contaminants, including twenty test pits. DEM points to its Exhibit D to show that the soil testing locations were reasonably well distributed throughout the Site. DEM claims analysis included tests for VOCs, polychlorinated biphenyls ("PCBs"), total petroleum hydrocarbons ("TPH") and RCRA-8 metals (arsenic, barium, cadmium, chromium, lead, mercury, selenium and silver). With the exception of one exceedance for TPH, DEM argues the predominant soil contaminants observed across the Site were lead and arsenic, which are common urban contaminants. DEM maintains that these analytical findings resulted in the capping of the Site to prevent direct exposure to soils contaminated with these metals.
[7] The City's analysis of the groundwater found no exceedance of DEM's established "GB Ground Water Objectives" at 23 groundwater sampling points. See Remediation Regulation Table 4, and Pl. Ex. 38, Tables 2 and 5. Furthermore, Crawford testified that both the Site and all surrounding areas were classified as "GB" groundwaters, which are defined by statute as "groundwater sources which may not be suitable for public or private drinking water without treatment due to known or presumed degradation." Section 461-3.1-4(a)(3).
[8] While Plaintiffs' Count Three, as worded in their First Amended Complaint, only seeks relief under Title VI pursuant to § 1983 without mention of a direct cause of action, such a private right of action exists under Section 601 of Title VI. Alexander v. Sandoval, 532 U.S. 275,279-290 (2001) (providing that "private individuals may sue [through a private cause of action] to enforce § 601 of Title VI and obtain both injunctive relief and damages."). Still, this Court allowed both of the Plaintiffs' Title VI claims to proceed to trial for various reasons: the Defendants had actual notice of the dual causes of action pursued by the Plaintiff pursuant to § 601 of Title VI, the Defendants did not object, and the First Amended Complaint "[gave] the opposing party fair and adequate notice of the type of claim being asserted." Haley v. Town ofLincoln, 611 A.2d 845, 848 (R.I. 1992).
[9] While the Muncipal Defendants do not deny that the PSB relies on federal financial assistance in providing programs to school children, they assert that Title VI doesn't apply because the act of siting a building for use as a school is neither a program or an activity and is not dependent on the use of federal funds. However, since the City and the PSB admittedly receive federal financial assistance, § 601 applies to all of the Defendants' activities because the law "encompasses all activities of a recipient of federal financial assistance on an institution-wide basis." Cureton v. Nat'l Collegiate Athletic Ass'n,198 F. 3d 107, 115 (3d Cir. 1999).
[10] The Plaintiffs quoted concerns directly out of the City's notes. Ms. Sheila Conway, a Providence School Department employee and teacher, stated "How can you think about doing this? It is unbelievable to me. I will not teach in that school. I won't work in a school that is on a dump. I can't believe that this is happening and I can't believe that you think this is good for your people. Would you have your children go there? My family members won't go there." (Exhibit 10 at 14) Also, Mrs. Pena stated "In 20 years from now, you won't be in Providence. Our children will be in Providence. Our people will be in Providence and they will be sick. I know what I know today, and you can build your school and you can be superintendent of that school, but my children, meaning Latino children, won't go to that school." Id. at 14-15. Furthermore, Mrs. Martineau stated "We know the school is going in. We know it is a done deal. We went to bed one night and everything was status quo, and we woke up the next morning and they were putting up a school and nobody told us what was going on." Id. at 24.
[11] While the Rhode Island Supreme Court has not enunciated a standard for proving discrimination by the State or its agent pursuant to the Rhode Island Constitution, Plaintiffs assert that proof of a violation of the Equal Protection Clause of the United States Constitution would be satisfactory. Therefore, they argue that the test is the same.
[12] DEM points out that, in addition to arsenic and lead (contaminants found in the Site here), the Lucero site investigation also identified other contaminants — carbon tetrachloride, benzopyrene, benzo(a)pyrene, trichlorethene, polynuclear aromatic hydrocarbons (PNAs), and polychlorinated bi-phenyls (PCBs). Lucero, at 5-6. Furthermore, DEM notes that in Lucero, construction workers reported strong petroleum odors during construction, and the contamination was found to have impacted groundwater. Id. at 12, 6.
[13] The approved remedy in Lucero was limited to the removal of some contaminated soil and the installation of an engineered cap with twelve to eighteen inches of crushed concrete and soil in those areas not covered by foundations or asphalt. Id. at 9-11. In Lucero, the remedy did not provide for sub-slab ventilation or for an extended, 20-year post-remedy monitoring regime as was required at this Site.
[14] The parties provided considerable information on the population breakdown between white and non-white students in Providence. For instance, in its first year of operation, the Springfield Street Elementary School was comprised of 16% white and 84%non-white and the middle school was comprised of 30% white and 70% non-white. Also, during that same year only one of twenty-seven elementary schools in Providence had a majority of white students.
[15] Plaintiffs continue to insist that the remedy should have been based on application of the Solid Waste Regulations, which this Court has held inapplicable.
[16] Cf. Lucero, 160 F. Supp. at 772 ("Defendants did not seriously consider an alternative site").
[17] Plaintiffs derive their claim of entitlement from the following: "The department of environmental management will develop and implement a process to ensure community involvement. . . . That process shall include . . . (1) Notification to abutting residents when a work plan for a site investigation is proposed; (2) Adequate availability of all public records concerning the investigation and clean up of the site, including, where necessary, the establishment of informal repositories in the impacted community; and (3) Notification to abutting residents, and other interested parties, when the investigation is deemed complete by the department of environmental management." § 23-19.14-5; "Public Notice is required at two (2) points during the Site Investigation. (A.) Prior to the implementation of the Site Investigation field activities, the performing party must notify all abutting property owners and tenants that an investigation is about to occur; and (B.) When the Site Investigation is deemed complete, the Department will issue a program letter confirming that the performing party has adequately assessed the nature and extent of contamination at the contaminated-site. Prior to the formal Department approval of the Site Investigation Report (in the form of a Remedial Decision Letter), the performing party must notify all abutting property owners, tenants and community well suppliers associated with any well head protection areas which encircle the contaminated site that the investigation is complete and provide them with findings of the investigation and any proposed remedial alternative which includes on-site treatment and/or containment of hazardous materials as part of the final remedy." CRIR 12-180-001 § 7.07; "Remedy Selection: Upon completion of the Site Investigation Report the Director shall issue a Remedial Decision Letter, identifying the preferred remedial alternative. All preferred remedial alternatives which included on-site treatment and/or containment of hazardous materials as part of the final contaminated-site remedy shall be subject to public notice as specified in rule 7.07 (Public Notice), and shall be subject to public review and comment regarding the technical feasibility of such preferred remedial alternative prior to issuance of the Remedial Decision Letter. If none of the proposed remedial alternatives are acceptable, the Director shall require the performing party to consider other remedial alternatives."Id. § 7.09.